**NISSHO–IWAI CO., LTD.,**
Plaintiff-Appellee,
Cross-Appellant,

v.

**OCCIDENTAL CRUDE SALES, INC.,**
Defendant-Appellant, Cross-Appellee.

**Robert B. Weintraub,**
Intervenor-Appellant.

No. 86–2809.

United States Court of Appeals,
Fifth Circuit.

July 1, 1988.

Amending Order of Aug. 1, 1988.

Louis Nizer, Jay F. Gordon, Clark Steven Abrams, Nancy M. Frieden, New York City, Linda L. Addison, Jerry V. Walker, Houston, Tex., for Occidental.

Larry H. Mitchell, Washington, D.C., for intervenor-Robert B. Weintraub.

Robert A. Meadows, Wm. B. Allison, Gordon A. Holloway, Gayle M. Pearson, Sewell & Riggs, Houston, Tex., for Nissho-Iwai Co., Ltd.

Before CLARK, Chief Judge, JOLLY, Circuit Judge, and BARBOUR *, Acting Chief District Judge.

CLARK, Chief Judge:

This may well be a case in which our effort to completely develop the issues misled rather than clarified the course of complex litigation. Whatever the cause, the fact remains that the district court misconstrued parts of the prior panel's mandate in this contract dispute between Nissho-Iwai Company (Nissho) and Occidental Crude Sales, Inc. (Occidental). To correct this error, we vacate the judgment notwithstanding the verdict and reinstate the zero damages verdict rendered by the jury. We also affirm the partial directed verdict on the settlement of shipping contract damages.

## I. Background

Our prior opinion detailed the nature of the dispute between Nissho and Occidental. *See Nissho-Iwai Co. v. Occidental Crude Sales, Inc.*, 729 F.2d 1530 (5th Cir.1984). We outline here only those facts necessary to understand today's rulings and to bring the procedural history of the case up to date. In 1971, Occidental contracted to sell "Zueitina Medium" crude oil to Nissho in varying quantities from October 1, 1972 to September 30, 1975. Nissho then negotiated a contract with Nereus Shipping Company (Nereus) to transport this oil from Libya to Japan. Nissho also entered into a contract with Kansai Electric Power Company (Kansai) to purchase this oil. Subsequently, Nissho and Occidental executed a new contract, Contract 1038, which, among other things, extended the purchase and sale relationship of Nissho and Occidental through December 31, 1978. Contract 1038 also designated California law as the law governing the agreement. Nissho and Nereus then extended their contract of affreightment to correspond with the amended duration of Contract 1038.

The prior panel determined that Occidental breached its contract with Nissho by failing to supply any oil during the last four months of 1975 and the first four months of 1976. Occidental's statement to Nissho that September 1975 oil would not be available because of production restrictions imposed by the Libyan Government was knowingly false. After Kansai cancelled its contract with Nissho, Nissho and Occidental agreed to suspend their contract from October 1, 1976 to March 31, 1977. Nissho's failure to load ships in September and October of 1975 prompted Nereus to file an arbitration claim for breach of the affreightment contract. Nissho settled this dispute by paying Nereus $2,225,000. Nissho maintains that $2,268,000, the cost of the settlement plus $43,000 in related

---

* Acting Chief District Judge for the Southern District of Mississippi, sitting by designation.

attorney fees, is attributable to Occidental's breach.

This case has now generated four jury verdicts in the course of three trials and two appeals.[1] Nissho originally filed suit against Occidental on April 21, 1980. The amended complaint sought damages for breach of contract and fraud. In February of 1982, a jury returned a verdict of $2,269,000 in contract damages and $2,250,000 in punitive damages for fraud. A mistrial was declared when the jury, after being recalled and instructed that compensatory damages for fraud are a prerequisite to an award of punitive damages, returned a second verdict awarding Nissho a total of $6,769,000 in damages. The second trial produced a jury award for Nissho of $7,025,000 in damages on the contract claim and $283,000 in damages on the fraud claim. Occidental appealed this verdict.

On that appeal, a panel of this court affirmed the finding that Occidental had breached its contract with Nissho and held that events in Libya did not relieve Occidental of liability under the contract's "Force Majeure" clause. The panel also remanded the case for a complete retrial of damages. Our opinion specifically indicated that Occidental could raise the reasonableness of the $2,225,000 settlement and the defenses of mutual suspension and termination. It also permitted Occidental to claim that section 9.2(g) of the contract barred recovery of all consequential damages. Finally, we held that California law did not permit Nissho to maintain a separate action for fraud because those injuries were not separate and distinct from the injuries caused by the breach of contract.

On remand, the trial judge ruled that section 9.2(g) of the contract was unambiguous and did not apply to the type of damages sought by Nissho. In an attempt to avoid airing the fraud issue before the jury trying damages, Occidental stipulated to the reasonableness of the Nereus settlement and withdrew its defenses of suspension and termination. The district court directed a verdict for Nissho on the Nereus settlement. The rest of the case was submitted to a jury which awarded Nissho no damages for lost profits or for loss of goodwill. The district court granted Nissho a judgment notwithstanding the verdict which reinstated the second jury's $7,025,000 award for breach of contract. The court's order also provided that if the judgment notwithstanding the verdict were set aside the court granted Nissho's motion for a new trial. Both parties appeal numerous points.

## II. Causation and Mitigation

Nissho sought damages from three sources: lost profits, loss of goodwill and its settlement with Nereus. The prior panel remanded issues of causation and mitigation as to lost profits and loss of goodwill but remanded only the reasonableness of the Nereus settlement. In the damages section of its opinion, the panel acknowledged that "Occidental raises a number of challenges to the amount of damages awarded Nissho" but "[b]ecause we find that the [suspension claim] has merit and requires a complete retrial of damages, we need not consider the other arguments in

---

**1.** The following is a chronological summary of the procedural history of this case.

First Trial
2/10/82 Jury verdict # 1
Contract damages: $2,269,000 (Nereus Settlement)
Punitive damages: $2,250,000
Jury verdict # 2
Contract damages: $2,269,000 (Nereus Settlement)
Fraud and punitive damages: $4,500,000
Mistrial declared
Second Trial
5/24/82 Jury verdict # 3

Contract damages: $7,025,000 (including Nereus settlement)
Fraud and punitive damages: $283,000
6/25/82 Judgment entered
First Appeal
4/23/84 Prior panel opinion
Third Trial
1/10/86 Directed verdict on Nereus Settlement
Jury verdict # 4
Contract damages: $0 (lost profits/goodwill)
7/28/86 JNOV reinstating $7,025,000 jury verdict # 3
9/12/86 Judgment entered
Second Appeal

detail." *Nissho,* 729 F.2d at 1546. The panel's detailed consideration of the suspension claim discusses causation and mitigation as they pertain to lost profits and loss of goodwill. *Id.* at 1547.[2] The panel remanded these issues as part of "a complete retrial of contract damages." *Id.* at 1548. The damages section of the opinion discusses the Nereus settlement under a separate subheading. *Id.* at 1549. The panel addressed only the trial court's refusal to give an instruction on the reasonableness of the settlement amount. Causation and mitigation are not mentioned. The panel did not remand the Nereus settlement for a complete retrial on damages; instead, it remanded so that Occidental might challenge "the reasonableness of the settlement." *Id.*

### A. Judgment Notwithstanding the Verdict

■ Without deciding whether Nissho preserved its right to move for a judgment notwithstanding the verdict under Federal Rule of Civil Procedure 50, we hold that the district court erred by granting Nissho's motion. The district court properly instructed the jury to consider causation and mitigation in connection with the claim for lost profits and loss of goodwill. After the jury returned a zero damages verdict, however, the district court granted Nissho's motion for a judgment notwithstanding the verdict. It held that the following three events eliminated all predicates necessitating a new trial on damages: (1) the ruling limiting the contract's consequential damages clause to demurrage claims; (2) the stipulation to the reasonableness of the Nereus settlement; and (3) the withdrawal of Occidental's defenses of suspension and termination. This decision to set aside the verdict was based on the flawed assumption that our prior opinion foreclosed issues of causation and mitigation on the claim for lost profits and loss of goodwill. The district court therefore erred by granting the

judgment notwithstanding the verdict and by reinstating the $7,025,000 jury verdict.

### B. Directed Verdict on the Nereus Settlement

■ Before voir dire, Occidental stipulated that the amount Nissho had paid Nereus and the $43,000 in related attorneys' fees it had incurred constituted a "reasonable sum." Occidental did not stipulate to causation and mitigation. At the time of the stipulation, Occidental stated "[w]e do not admit that we, therefore, are liable for it, but we admit that it was reasonable." In a telephone conference later that day Occidental argued to the judge that causation and mitigation remained at issue despite its stipulation to reasonableness. At the close of all the evidence, however, the judge granted Nissho's motion for a directed verdict on the grounds that the stipulation to reasonableness resolved the only issue regarding the Nereus settlement which our prior opinion left open for retrial. Despite Occidental's protestations to the contrary, the district court properly interpreted the prior opinion. It may be that Occidental made a tactical error by entering the stipulation. If it did, it cannot rue back the bargain it made. We affirm the directed verdict on the Nereus settlement in the amount of $2,268,000 and remand to the district court with directions to enter judgment in accord with this opinion.

■ Occidental raises three other points of error that we now address. The first point relates to the district court's offer to let Occidental withdraw its stipulation to the reasonableness of the Nereus settlement. Occidental declined to do so unless the court would rule inadmissible certain testimony by Hattrick, the British solicitor who represented Nissho during the Nereus arbitration. Hattrick would have testified that Occidental withheld certain information from Nissho during the arbitration proceedings. The district court ruled that if Occidental withdrew its stipulation to the

---

**2.** The only time the Nereus settlement is mentioned during the discussion of the suspension defense is when the panel notes that the jury awarded Nissho damages for lost profits during

the period of mutual suspension. *Nissho–Iwai Co. v. Occidental Crude Sales, Inc.,* 724 F.2d 1530, 1547 (5th Cir.1984).

reasonableness of the settlement amount, Hattrick's testimony would be admissible. Occidental contends that this ruling would permit the issue of fraud to creep back into the case in contravention of our earlier mandate. Occidental also argues that this ruling violates Federal Rule of Evidence 403 because Hattrick had stated that the Nereus settlement would not have been different had he been apprised of the withheld information. Neither argument is well taken.

The information that became available to Hattrick during negotiations with Nereus is relevant to the reasonableness of the settlement. While its admission would reflect on Occidental's behavior, such prejudice does not preclude its use. Rather, it calls for precisely the sort of balancing of probative value and unfair prejudice which was made here. The district court did not abuse its discretion by ruling that Hattrick's testimony did not violate Rule 403. *Sprankle v. Bower Ammonia & Chemical Co.*, 824 F.2d 409, 416 (5th Cir.1987). Hattrick's statement that additional information would not have influenced the settlement went to the weight of the evidence. It did not *ipso facto* preclude its admissibility. In this context, admission of this evidence would not have violated our prior mandate which only preempted Nissho from maintaining a fraud-based cause of action. Sufficient judicial resources have been expended on procedural gyrations in which Occidental has previously acknowledged the reasonableness of the Nereus settlement. *Nissho*, 729 F.2d at 1549. Occidental had ample opportunity to withdraw its stipulation and the district court did not err by rejecting the conditions Occidental placed on withdrawal.

■ Occidental also claims that it withdrew its suspension and termination defenses in response to rulings by the trial court which would have allowed the issue of fraud to be reinjected back in the case. The panel directed that "[a]t retrial, Nissho may attempt to prove that the contract was not in fact suspended between October 1, 1976 and March 31, 1977. The record before us only supports a finding that there was a suspension; but it is conceivable that there is some evidence not previously introduced that disproves the suspension." *Id.* at 1548 n. 29. On remand, Nissho amended its complaint to allege that the suspension was not mutual and termination was ineffective because of misrepresentations made by Occidental. Occidental moved to exclude the evidence offered by Nissho, all of which was duplicative of or cumulative to the evidence submitted on the fraud claim at the second trial. The district court ordered Nissho not to use the word "fraud," but ruled that the evidence would be admitted to rebut the suspension and termination defenses. In support of its claim that the district court's action was improper, Occidental would have us read the panel's directions to stand for two propositions. First, the evidence of misrepresentations is not relevant to the suspension defense because this evidence was before the panel which held that the record supported a finding of mutual suspension. Second, only evidence not previously introduced could be adduced on retrial. We disagree with both propositions for the same reason. The panel never discussed the misrepresentations in relation to suspension or termination. Such misrepresentations are clearly relevant to these defenses. We hold that the district court correctly construed the panel opinion and that Occidental waived its suspension and termination defenses by amending its answer to withdraw these defenses. *See* Fed.R.Civ.P. 8(c); *Henry v. First Nat'l Bank*, 595 F.2d 291, 298 n. 1 (5th Cir.1979) (affirmative defenses "are considered waived if not pleaded in the trial court").

Lastly, Occidental contends that, as a matter of law, its breach of contract did not cause Nissho to sustain damages under the contract with Nereus. California law requires consequential damages to be foreseeable "as of the time the contract was entered into and not as of the time of the breach or some other subsequent event." *Gerwin v. Southeastern Calif. Ass'n of Seventh Day Adventists*, 14 Cal.App.3d 209, 220, 92 Cal.Rptr. 111, 118, (1971). Occidental maintains that it cannot be found to have reasonably contemplated in Octo-

ber 1973 that breach of Contract 1038 might cause damage to Nissho by reason of a settlement relieving Nissho of obligations under a subsequently extended contract of affreightment. This argument has no merit. On the date Occidental executed Contract 1038 it should reasonably have foreseen that Nissho would make arrangements to transport the oil from Libya to Japan, and that if Occidental failed to deliver oil, such nonperformance would cause Nissho to breach its transportation contracts.

### III. New Trial

Despite the district court's direction that counsel not raise the issue of the breach and its causes, Occidental's closing argument made references to Colonel Moammar Khadafy and to current events in Libya. The district court's grant of judgment notwithstanding the verdict alternatively granted a new trial if the judgment setting aside the verdict was overturned. The reasons given for granting the motion for a new trial were that "Occidental engaged in improper jury argument by (a) arguing matters of liability; (b) arguing outside the record; and (c) appealing to the passion and prejudice of the jurors." The district court also conditionally granted the new trial because notes which the jury sent to the court during deliberation reflected "failure to follow the court's instructions" and "manifest confusion."

■■ A district court may order a new trial if improper closing argument irreparably prejudices a jury verdict or if a jury fails to follow instructions. The grant or denial of a new trial will not be reversed unless the district court abused its discretion. *Carson v. Polley*, 689 F.2d 562, 570 (5th Cir.1982). Although the standard of review remains abuse of discretion, when the district court grants a new trial our inquiry generally is broader because of our respect for the jury as an institution and our concern that the party who persuaded the jury should not be stripped unfairly of a favorable decision. *Id.* We examine the propriety of closing argument by reviewing the entire argument "within the context of

the court's rulings on objections, the jury charge, and any corrective measures applied by the trial court." *Westbrook v. General Tire & Rubber Co.*, 754 F.2d 1233, 1238 (5th Cir.1985) (per curiam).

■ We reverse for several reasons. First, Nissho waived any objection to the impropriety of Occidental's closing argument. We agree with the district court that Occidental's references to Khadafy and events in Libya exceeded proper bounds and did not relate to any issue before the jury. But Nissho failed to object to Occidental's tactics either at the time of the argument or at a sidebar conference immediately thereafter. Instead, counsel for Nissho chose to adopt the strategy of using his final argument to rebut Occidental's improper closing argument. Nissho did not move for a mistrial before the case was submitted to the jury. In preparing to address the first question raised in the jury's first note the district court observed to counsel: "Why Occidental did what they did—and I almost interrupted your argument about Khadafy. That's all been decided. It is Occidental's fault. It wasn't Khadafy's fault, or it wasn't OPEC's fault. I don't know whether that is right or not, but that is the law of the case." Nissho did not move for a mistrial at this time. Rather, Nissho chose to submit the case to the jury. Not until its strategy failed did Nissho register its first complaint about Occidental's closing argument. Nissho is now barred "from urging the improper arguments as grounds for a new trial after the jury had returned its verdict." *Computer Sys. Eng'g, Inc. v. Qantel Corp.*, 740 F.2d 59, 69 (1st Cir. 1984); *see also Brown & Root, Inc. v. Big Rock Corp.*, 383 F.2d 662, 666–67 (5th Cir. 1967); 11 C. Wright & A. Miller, Federal Practice and Procedure § 2805, at 39 (1973).

■ Second, the district court erred by concluding that its responsibility to ensure "substantial justice" and to guard against procedural defects that affect "substantial rights" required a new trial despite Nissho's failure to object. *See* Fed.R.Civ.P. 61; *Rojas v. Richardson*, 713 F.2d 116, 118

(5th Cir.1983). *Cf. Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 286 (5th Cir.1975) (failure to object to closing argument did not result in waiver because substantial justice was jeopardized). The court properly focused the attention of the jury on the question of damages by instructing the jury to consider that the breach was proven and that Occidental's default was without excuse.[3] The court also instructed the jury that nothing said by the lawyers was to be considered as evidence and admonished the jury not to be swayed by emotion or prejudice.

Assuming that the jury notes indicated some confusion or lack of understanding or an inability to follow the court's initial instructions, the specific instructions issued from the bench in response to the jury's inquiries effectively negated any confusion or impropriety. In the first note, the jury's first question asked, "Why did Occidental Petroleum originally cut the supply of oil to Nissho-Iwai?" After discussing possible answers with counsel for both parties, the court instructed the jury to disregard the issue of liability and clearly directed the jurors' attention to the issue of damages. The answer stated: "Occidental had no legal excuse not to deliver the oil. Do not concern yourselves with any issue except the amount of damages, if any, caused by the breach." In that first note, the jury also raised a second question: "When Mr. Fujino did his figures on the map, was he figuring the time it took to run the ship *through* the Suez Canal to the United Kingdom or under South Africa?" The court replied that "[t]he route of the vessels was around the Cape of Good Hope of South Africa."

The two questions in the jury's second note addressed an issue central to the claim for lost profits—the relationship between Nissho and Kansai. The district court had initially instructed the jury that in order to

find lost profits it had to find that Occidental's breach caused Kansai to cancel or refuse to extend its contract with Nissho. The first question of the second jury note asked whether there was "a written [agreement] between Kansai and Nissho-Iwai to cancel or not renew the original contract?" Counsel for both parties agreed that the court's answer—"No."—was appropriate.[4] Nissho argued that Kansai had made an oral commitment to extend the contract. The fact that the jury inquired whether there was a written cancellation or extension does not establish confusion or failure to give due consideration to Nissho's argument. The jury, apparently unable to locate the original written contract among the numerous exhibits, also asked whether there was "a written contract between Nissho-Iwai to sell [Zueitina Medium] oil to Kansai?" The district court's response directed the jury to the appropriate exhibit number (Plaintiff's Exhibit 166). Nissho did not object to any part of the procedure followed or to any of the answers that the court submitted to the jury.

Three juries have deliberated and rendered verdicts in this case. The more the parties litigate the more they depart from a straightforward presentation of evidence and wander into the psychological maze of calculating how the jury might react to this or that collateral issue. The time has come to end the trial on contract damages. Neither the verdict nor the questions asked by this jury indicate anything other than a reasonable process of arriving at a proper verdict. We reverse the district court's conditional grant of Nissho's motion for a new trial.

## IV. Indirect and Consequential Damages Clause

Section IX of Contract 1038 comes under the heading "Berth, Loading and De-

---

3. The jury instruction provided:

   Nissho is seeking damages from Occidental because of Occidental's failure to deliver oil under a contract between the parties. It has been determined that Occidental's failure to deliver oil was an unexcused breach of Contract 1038. Occidental's liability to Nissho has been established; you will not address

that issue. Your deliberations will be directed solely to the issue of Nissho's damages, if any.

4. As part of the first question the jury also asked, "If so ... what exhibit has it been labeled?" The court answered, "Not applicable."

murrage." Section 9.1 deals generally with berthing responsibilities. Subsections 9.2(a)-(f) describe demurrage charges that Occidental was obligated to pay if Nissho's vessels were delayed at port. Subsection 9.2(g) provides: "No claim shall be made by [Nissho] under any circumstances for indirect and consequential damages except as may otherwise be provided herein." Section 20.1 of Contract 1038 provides that headings do not necessarily control content.[5] Occidental argued on retrial that subsection 9.2(g) is not restricted to demurrage claims and barred Nissho from recovering all damages claimed in this suit. The district court, however, held as a matter of law "that § 9.2(g) of the Contract is unambiguous and relates only to demurrage claims."

On appeal, Occidental argues that the district court misread the panel opinion. The prior panel declined to decide whether subsection 9.2(g), raised for the first time on appeal, constituted a complete defense because "[i]t is not clear that the proper interpretation of [this subsection] would have involved a pure question of law had it been raised properly at trial." *Nissho,* 729 F.2d at 1549. Occidental reads the balance of the opinion's discussion of subsection 9.2(g) to stand for two propositions. First, if subsection 9.2(g) is unambiguous it applies to all claims by Nissho for consequential damages. Second, it is Nissho's burden to establish an ambiguity and raise an issue of fact.

Occidental's interpretation of the panel opinion is incorrect. Although the prior panel did opine that the placement of the single reference to consequential damages near the end of the lengthy, precisely defined demurrage provisions made it at least ambiguous whether it applied to any other part of the contract, there are only two decisional aspects to the panel's discussion of subsection 9.2(g). First, the panel could not resolve the question on that prior appeal because it might involve facts not yet decided. Second, Occidental was not to be

precluded from raising the clause during the retrial on damages. On remand, Occidental failed to protect its right to offer factual evidence to establish the ambiguity the panel noted might exist. We affirm the district court ruling that section 9.2(g), when headings are ignored and the contract is read as a whole, "is unambiguous and relates only to demurrage claims."

### V. Fraud

█ The prior panel opinion held that California law did not permit Nissho to recover actual and punitive damages for fraud. Two years after the panel opinion, the California Supreme Court held that a party to a commercial contract may "incur tort remedies when, in addition to breaching the contract, it seeks to shield itself from liability by denying, in bad faith and without probable cause, that the contract exists." *Seaman's Direct Buying Serv., Inc. v. Standard Oil Co.,* 36 Cal.3d 752, 769, 686 P.2d 1158, 1167, 206 Cal.Rptr. 354, 363 (1984). Nissho contends that its fraud cause of action against Occidental is now proper under *Seaman's* and its progeny and that we should now remand this claim to the district court. Despite our strict rule of binding precedent, this panel could modify a prior panel's mandate where "controlling authority has since made a contrary decision of the law applicable to such issues." *White v. Murtha,* 377 F.2d 428, 432 (5th Cir.1967).

*Seaman's* identifies certain situations where tort remedies will be available "in the context of the ordinary commercial contract." *Seaman's,* 36 Cal.3d at 769, 686 P.2d at 1166, 206 Cal.Rptr. at 362. *Seaman's* permits recovery of punitive damages where a party to a commercial contract denies in bad faith or without probable cause the existence of a contract. The only other case Nissho cites that applies the *Seaman's* rule also involves bad faith denial of the existence of a contract. *See Landsberg v. Scrabble Crossword Game*

---

**5.** Section 20.1 reads:

The headings herein are for convenience and are not to be relied upon or to be considered part of this Agreement. In some instances, a section contains provisions not covered by the heading. In other instances a section contains provisions that are described in the heading of another section.

*Players, Inc.*, 802 F.2d 1193, 1199 (9th Cir. 1986) (applying California law). Nissho does not allege that Occidental denied the existence of Contract 1038 in bad faith or without probable cause as did the defendant in *Seaman's*.[6] Although there is "business ethics" language in *Seaman's* that might support a broader rule,[7] we conclude that in this newly developing area of law the California Supreme Court meant for the *Seaman's* rule to be applied narrowly. Any broadening of the rule should come first from that court. The *Seaman's* case does not reinvigorate Nissho's action for fraud and recovery of punitive damages.

## VI. Postjudgment Interest

Prior to recent amendment, the federal postjudgment interest statute provided: "Interest shall be allowed on any money judgment in a civil case recovered in a district court.... Such interest shall be calculated from the date of the entry of judgment, at the rate allowed by state law." 28 U.S.C.A. § 1961 (1982). In 1982, Congress amended the latter part of this statute to provide: "Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to [the United States Treasury Bill rate]." *Id.* (Supp. 1987) (as amended). Nissho argues that the district court erred by not applying state law to determine the rate of post-

judgment interest. The applicability of section 1961 as amended to diversity cases has not been resolved by this circuit. *See Bartholomew v. CNG Producing Co.*, 832 F.2d 326, 330 n. 3 (5th Cir.1987). We agree with the eighth, tenth and eleventh circuits which have expressly held that the amended federal postjudgment interest statute applies in diversity cases. *See Everaard v. Hartford Accident & Indem. Co.*, 842 F.2d 1186 (10th Cir.1988), *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1542 (11th Cir.1985) (per curiam); *Weitz Co. v. Mo-Kan Carpet, Inc.*, 723 F.2d 1382, 1385–87 (8th Cir.1983).[8] We also agree with the sixth circuit which has held that federal law determines when postjudgment interest begins to accrue. *Bailey v. Chattem, Inc.*, 838 F.2d 149, 151–53 (6th Cir. 1988).

Nissho contends that the amended statute should be construed to not displace state law in diversity cases. Prior to the 1982 amendment, courts held that the *Erie* doctrine dictated that state postjudgment interest statutes applied in diversity cases notwithstanding section 1961. *See, e.g., Budge v. Post*, 643 F.2d 372, 375 (5th Cir. 1981) (per curiam). Nissho argues that Congress, by changing only the rate of interest, cannot be said to have intended to alter the interest rate applicable in diversity cases. We disagree.

---

**6.** Nissho only alleges that Occidental misrepresented the reasons for failing to perform the contract:

> When Occidental was unable to supply oil in 1975 and early 1976, it made a number of misrepresentations to Nissho. For example, Occidental stated that it was unable to supply Zueitina Medium in September, 1975, because of production restrictions. That statement was untrue. Occidental also allegedly gave false assurances as to when oil would again be available.
>
> Because of these misrepresentations, Nissho pleaded a separate count for fraud in this litigation.

*Nissho,* 729 F.2d at 1549 (footnote omitted).

**7.** It has been held that a party to a contract may be subject to tort liability, including punitive damages, if he coerces the other party to pay more than is due under the contract terms through the threat of a lawsuit, made "'without probable cause and with no belief in the existence of the cause of action.'" There is

little difference, in principle, between a contracting party obtaining excess payment in such manner, and a contracting party seeking to avoid all liability on a meritorious contract claim by adopting a "stonewall" position ("see you in court") without probable cause and with no belief in the existence of a defense. Such conduct goes beyond the mere breach of contract. It offends accepted notions of business ethics. Acceptance of tort remedies in such a situation is not likely to intrude upon the bargaining relationship or upset reasonable expectations of the contracting parties. *Seaman's,* 36 Cal.3d at 769–70, 686 P.2d at 1167, 206 Cal.Rptr. at 363 (citations omitted).

**8.** *Lazzara v. Esser,* 622 F.Supp. 48 (N.D.Ill.1985), *rev'd in part on other grounds,* 802 F.2d 260 (7th Cir.1986), holds that the state postjudgment interest rate applies in diversity cases. A more recent case from the same district is contrary. *See Commonwealth Edison Co. v. Decker Coal Co.,* 653 F.Supp. 841, 845 (N.D.Ill.1987).

Nissho's proposed construction violates the plain language of section 1961 which requires that a federal interest rate be used to calculate postjudgment interest "on any money judgment in a civil case recovered in a district court." The statute specifies no different treatment for diversity cases. Congress expressed its desire to establish "a realistic and nationally uniform rate of interest on judgments in the Federal courts" to eliminate the incentive for delaying payment of judgments and for filing frivolous appeals that existed when the state law postjudgment interest rate fell below the interest rate available on the market. S.Rep. No. 275, 97th Cong., 2d Sess 11, reprinted in 1982 U.S.Code Cong. & Admin.News 11, 21; *see also Weitz*, 723 F.2d at 1386–87. This policy cannot be fully achieved unless the federal interest rate is applied to judgments rendered in both diversity and nondiversity based cases. For these reasons, we conclude that Congress implicitly intended federal courts to apply the amended statute in diversity cases.

Nissho incorrectly maintains that its construction should be adopted because it pretermits a substantial constitutional question. The Constitution confers on Congress the general power to "ordain and establish" inferior federal courts and the power to pass laws "necessary and proper" to execute such enumerated powers. U.S. Const. art. III, § 1; *id.* art. I, § 8, cl. 9 & 18. This authority does not include "the power to declare substantive rules of common law applicable in a state." *Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). However, it is appropriate for the institution vested with the power to create a judicial tribunal to define that tribunal's procedure and to regulate matters "falling within the uncertain area between substance and procedure" but "rationally capable of classification as either." *Hanna v. Plumer*, 380 U.S. 460, 472, 85 S.Ct. 1136, 1144, 14 L.Ed.2d 8 (1965); *see also Burlington N.R.R. v. Woods*, 480 U.S. 1, —— n. 3, 107 S.Ct. 967, 969 n. 3, 94 L.Ed.2d 1 (1987).

The cases cited by Nissho that characterize the rate of interest and its accrual as "substantive" do not do so in the context of a congressional postjudgment interest statute plainly directing federal courts to apply a federal interest rate in diversity cases. *See, e.g., Massachusetts Benefit Ass'n v. Miles,* 137 U.S. 689, 691, 11 S.Ct. 234, 235, 34 L.Ed. 834 (1891); *Klaxon v. Stentor,* 313 U.S. 487, 497, 61 S.Ct. 1020, 1022, 85 L.Ed. 1477 (1941). Although *Affiliated Capital Corp. v. City of Houston,* 793 F.2d 706, 709 n. 3 & 5 (5th Cir.1986) (en banc), intimates that a federal court sitting in diversity must apply state law regarding rate and accrual of interest, it did not consider passage of the 1982 amendment to section 1961. These cases do not limit the power of Congress to enact a federal postjudgment interest rate applicable in diversity cases and do not proscribe accrual in accord with federal common law. They neither employ a post-*Erie* analysis of the substance/procedure dichotomy nor do they consider a congressional statute directly on point in which case the Supreme Court requires substantial deference to the judgment of Congress. *See Hanna,* 380 U.S. at 471–74, 107 S.Ct. at 1144–45; *see also Bailey,* 838 F.2d at 152–53; Ely, *The Irrepressible Myth of* Erie, 87 Harv.L.Rev. 693, 701–06 (1974).

If postjudgment interest is not wholly procedural, it certainly is rationally capable of classification as either substance or procedure, whatever the standards employed. Postjudgment interest has a substantive characteristic because the applicable rate of interest and rules of accrual can increase or decrease the amount of a monetary award. But postjudgment interest is better characterized as procedural because it confers no right in and of itself. Rather, it merely follows and operates on the substance of determined rights. Postjudgment interest is designed to compensate "a successful plaintiff for the time between his entitlement to damages and the actual payment of those damages by the defendant." *Bailey,* 838 F.2d at 152. Substantive law substantially affects "primary private activity" while procedure substantially affects litigation conduct. *Hanna,* 380 U.S. at 474–75, 85 S.Ct. at 1145–46

(Harlan, J., concurring). "We doubt that anyone plans business conduct on the expectation that if a controversy erupts suit will be filed in federal court, rather than a state court, for the purpose of obtaining the benefit of a federal statute on postjudgment interest." *Weitz,* 723 F.2d at 1386; *see also Bailey,* 838 F.2d at 152. More certainly postjudgment interest affects litigation related conduct—whether to appeal a judgment and the time within which a judgment is satisfied. Indeed, the federal interests advanced by section 1961 relate to the effect postjudgment interest has on litigation conduct. The risk of forum shopping by out of state plaintiffs based on differences in postjudgment interest rates is minimal because the federal rate fluctuates and is not fixed until the time of judgment. *Weitz,* 723 F.2d at 1388. Any differences in postjudgment interest rates or rules of accrual do not furnish any greater incentives to use the courts of the United States than most of the other procedural features which are unique to the federal forum. Since the postjudgment interest rate may be rationally classified as procedural, both the Supremacy Clause, U.S. Const. art. VI, and the Rules of Decision Act, 28 U.S.C.A. § 1652 (1966), command application of section 1961 in favor of otherwise applicable state law and federal courts may properly devise rules of accrual.

■ We therefore apply section 1961 in light of federal law. The district court awarded postjudgment interest beginning September 12, 1986, the date judgment was entered following the third trial. Nissho contends that interest should begin accruing on June 25, 1982, the date judgment was entered following the second trial.[9] Section 1961 provides that interest "shall be calculated from the date of the entry of judgment." This court equitably construes the "entry of judgment" requirement to assure that a wronged plaintiff is compensated "for the loss of the use of a money judgment." *Affiliated Capital,* 793 F.2d at 710. We hold that, as a matter of equity, postjudgment interest should run from June 25, 1982. This is the date that judgment was entered on the $7,025,000 jury verdict, the third jury verdict which includ-

ed the amount of the Nereus settlement. *Nissho,* 729 F.2d at 1547. (See also the chronology set out in the margin above.) At least five and a half years have now elapsed since Occidental was held liable for the Nereus settlement. The prior panel affirmed the jury's finding of breach. On remand, Occidental stipulated to the reasonableness of the Nereus settlement—the only issue remanded on this component of Nissho's claim for damages. Under these circumstances, to award postjudgment interest to Nissho at a date any later than June 25, 1982 would be to deprive Nissho of compensation for the loss of use of its money damages due to the procedural vacillation of Occidental. Occidental maintains that the district court must calculate interest using September 12, 1986 as the starting date because the mandate of the prior panel did not include instructions on the question of interest. *See Briggs v. Pennsylvania R.R.,* 334 U.S. 304, 306, 68 S.Ct. 1039, 1040, 92 L.Ed. 1403 (1948); *see also* Fed.R.App.P. 37 ("If a judgment is modified or reversed with a direction that a judgment for money be entered in the district court, the mandate shall contain instructions with respect to allowance of interest."). The panel did not direct the district court to enter judgment for money and a judgment for Nissho was not an inevitable consequence of the remand. In any event, we now modify our prior mandate to achieve this end so that justice might be served. *See Reaves v. Ole Man River Towing, Inc.,* 761 F.2d 1111, 1112–13 (5th Cir.1985).

■ We hold that postjudgment interest accrues on June 25, 1982, a date that precedes the October 1, 1982 effective date of the amendment to section 1961. The amended statute does not apply retroactively to judgments entered prior to its effective date. *Brooks v. United States,* 757 F.2d 734, 741 (5th Cir.1985). The state rate of interest should be applied from June 25, 1982, the date interest begins to accrue, until September 12, 1986, the date the district court entered judgment on remand. From that date forward postjudgment interest should be calculated using the federal rate of interest. *Reaves,* 761 F.2d at 1113. We remand to the dis-

---

**9.** Both verdicts returned during the first trial on Nissho's breach of contract claim included compensation for the Nereus settlement. *Nissho,* 729 F.2d at 1587 & n. 7. The first trial was ultimately declared a mistrial and judgment was not entered on either of these jury verdicts.

Because Nissho does not contend that interest should run from a date earlier than June 25, 1982 we need not decide if an earlier date would be appropriate. *See Bailey,* 838 F.2d at 150 n. 1.

trict court for computation of postjudgment interest in accord with this opinion.

## VII. Attorney Disqualification

A magistrate's discovery control order directed "[t]he parties [to] arrange for a representative of Kansai to be available to be deposed either in the United States or Japan." Without notifying Nissho's American counsel, Occidental's counsel (through Japanese counsel) contacted Mr. Hori and Mr. Matsumoto, two Nissho employees, to arrange a Kansai deposition. Nissho's counsel objected to this direct contact with its client and a magistrate disqualified three attorneys, Jay Gordon, Paul Martinson and Robert Weintraub, who were affiliated with the law firm of Phillips, Nizer, Benjamin, Krim & Ballon. The district court independently determined "that proper application of the standards of professional conduct require[d] disqualification of" the three attorneys.

Occidental appeals the disqualification. Mr. Weintraub, no longer associated with the firm representing Occidental, intervenes and argues that he should not have been disqualified because he was not personally involved in any of the allegedly unethical conduct. While no proof of Mr. Weintraub's involvement was made, this issue was not submitted to the trial court until after it ordered the disqualification of the attorneys. Counsel for Nissho concedes that the order of disqualification presently serves no purpose. Therefore, we vacate the disqualification ruling as to all three attorneys so that it will spawn no consequences. *See, e.g., In re S.L.E., Inc.,* 674 F.2d 359, 363–64 (5th Cir.1982) (mootness doctrine requires adversarial conflict throughout each stage of the litigation).

## VIII. Conclusion

We reverse the district court's order granting judgment notwithstanding the verdict and reinstating the second jury's verdict on contract damages. We affirm the directed verdict on the Nereus settlement and remand to the district court to enter judgment on this issue in accord with our discussion of postjudgment interest. The district court's ruling on the consequential damages clause is also affirmed. We decline to modify the prior panel's holding on Nissho's claim for fraud. Finally, the order disqualifying counsel is vacated as moot. The judgment appealed from is

AFFIRMED in part, REVERSED in part, VACATED in part, and, in part, REMANDED.

## ORDER

BY THE COURT:

On the unopposed motion of appellee-cross appellant, Nissho-Iwai Co., Ltd., the opinion of this court dated July 1, 1988, is amended to provide that, in addition to the postjudgment interest specified therein, the judgment in favor of Nissho-Iwai Co., Ltd., shall bear prejudgment interest on the amounts, at the rates and from the initial dates provided in the first three items listed in the district court's judgment of September 12, 1986, until June 25, 1982, the date when postjudgment interest commences.