**Doris Velez VDA. de PÉREZ, etc., et al., Plaintiffs, Appellees,**

v.

**HOSPITAL del MAESTRO, et al., Defendants, Appellees.**

**Appeal of Dr. Carmen de LEÓN, Defendant.**

**Nos. 89–2018, 89–2086.**

United States Court of Appeals, First Circuit.

Heard May 11, 1990.

Decided Aug. 13, 1990.

ent hospital, Guadalupe Hospital, ten to fifteen minutes away. In the ambulance Pérez developed a complication, called "arrythmia," and he died within a few minutes of reaching Guadalupe.

The plaintiffs' basic claim was that the Hospital, and one of the doctors, Dr. José Vázquez Sellés, acted negligently in refusing to admit Pérez to its coronary care unit. Plaintiffs said they refused simply because Pérez carried a kind of insurance, namely Blue Cross insurance, that the Hospital did not accept. The Hospital and Dr. Vázquez, in a sense, have conceded that they acted negligently in this respect, for they settled the case against them, the Hospital paying $700,000 and Dr. Vázquez paying $240,000.

The plaintiffs continued to pursue their related claim that the second doctor, the emergency room physician Dr. Carmen de León, was *also* responsible for Pérez's death through her own negligence. They said that *her* negligence consisted, in essence, of (1) having failed to administer a drug called Lidocaine, and (2) having failed to keep Pérez *in the emergency room* of the Hospital del Maestro, instead of sending him off to Guadalupe Hospital.

After a jury trial, the jury found in favor of Dr. de León. The plaintiffs moved for a new trial on the ground (in the district court's words) that the "weight of the evidence overwhelmingly established that de León was negligent." And, the district court granted this motion because, in its view, "even granting that the evidence was more than sufficient to sustain a finding by the jury" on the Lidocaine issue and "all secondary controversies," nonetheless, "crucial, uncontroverted evidence leads to the inevitable conclusion that Dr. de León was negligent," in that "it was unsafe and unreasonable for her to transfer this patient at this time."

A second jury, at the second trial, found Dr. de León negligent, evaluated the harm that the plaintiffs suffered, and awarded damages of $500,000. Dr. de León appeals. She argues (1) that the judgment against

David Rive–Rivera, with whom Vargas & Rive was on brief for appellant.

David Efron, with whom Antonio J. Amadeo–Murga was on brief for plaintiffs, appellees.

Before BREYER, Chief Judge, ROSENN,* Senior Circuit Judge, and CAMPBELL, Circuit Judge.

BREYER, Chief Judge.

The plaintiffs in this case, the wife and children of Reynaldo Pérez, originally sued the Hospital del Maestro and two doctors who worked there, claiming that the Hospital and doctors negligently caused Pérez's death. They said (without dispute) that Pérez walked into the emergency room of the Hospital del Maestro, two hours after having begun to suffer chest pains. The hospital emergency room doctor found that he had had a heart attack and treated him, but instead of then transferring him to the hospital's cardiac care unit, she put him into an ambulance and sent him to a differ-

her should be reduced by the amounts that the plaintiffs received as a result of their settlements with the Hospital del Maestro and Dr. Vázquez, and (2) that the district court should not have granted the plaintiffs' motion for a new trial. Although Dr. de León's argument on the first—damage reduction—issue is a powerful one, we shall not decide that question. Even were we to decide in appellant's favor, to reduce damages to zero would leave in effect a judgment against her, which could have collateral consequences. We therefore reviewed the record to see whether the evidence permitted the district court to grant the motion for a new trial. We conclude that it did not.

In considering whether or not the district court could lawfully grant the plaintiffs a new trial, we recognize that the district court has broad legal authority to determine whether or not a jury's verdict is against the "clear weight of the evidence." *See, e.g., Freeman v. Package Machinery Co.*, 865 F.2d 1331, 1333 (1st Cir.1988); *Milone v. Moceri Family, Inc.*, 847 F.2d 35, 37 (1st Cir.1988). We disturb that determination "only when there has been a clear abuse of discretion." *Freeman*, 865 F.2d at 1334. We also recognize, however, that the district court "should not act merely as a '13th juror,'" *Borras v. Sea–Land Service, Inc.*, 586 F.2d 881, 887 (1st Cir.1978), that it should not interfere with the verdict "'unless it is quite clear that the jury has reached a seriously erroneous result,'" *id.* (quoting 6A J. Moore, Moore's Federal Practice ¶ 59.08[5], at 59–160 to 161), and that its discretion when granting a new trial on the ground that the verdict is contrary to the great weight of the evidence is no longer "virtually unlimited." *Id.; see Coffran v. Hitchcock Clinic, Inc.*, 683 F.2d 5, 6 (1st Cir.1982) (same); *cf. Nissho–Iwai Co. v. Occidental Crude Sales, Inc.*, 848 F.2d 613, 619 (5th Cir.1988); 11 C. Wright & A. Miller, *Federal Practice & Procedure: Civil* § 2819, at 126 ("There is no Seventh Amendment problem, however, if the appellate court reverses the trial court's grant of a new trial [for the] court is not reexamining facts found by a jury but is reinstating the jury's findings as against the contrary findings of the judge."). Applying these standards to the record before us, we simply do not see how the district court could have concluded that "crucial, uncontroverted evidence" required a finding of negligence.

For purposes of this appeal, we assume (for the record contains strong evidence) that Dr. de León operated the emergency room, that she could not have secured Pérez's admission to the coronary care unit of the hospital (for Dr. Vázquez told her Pérez would not be admitted), and that the choice facing her consisted simply of either (1) sending Pérez to Guadalupe ten to fifteen minutes away or (2) keeping him in the emergency room. The record contains conflicting evidence about which was the wiser choice.

### Evidence supporting the plaintiffs

The evidence favoring the plaintiffs basically consists of testimony by the defendant herself and by the plaintiffs' expert Dr. Angel Román Franco. The defendant herself testified that del Maestro's emergency room had facilities that a cardiac patient might need, such as "a heart monitor, an oxygen machine, [and an] infusion pump." She testified that "one of the[ ] cubicles in the emergency room at the Hospital del Maestro was rather specialized to attend or care for patients having heart conditions or heart attacks."

The plaintiffs' expert, Dr. Angel Román Franco, a professor of pathology at the University of Puerto Rico, testified that it was important to administer Lidocaine soon after a heart attack as a prophylactic measure to prevent the very sort of arrythmia that killed Pérez. But, if Lidocaine was not given, then

The first thing you don't do is you don't get rid of the patient. Now you are obligated to be more aggressive and more watchful of your patient. It's not just ship him out. Now you really have a problem because your main weapon for controlling the potentially deadly arrhythmias, malignant arrhythmias, has been negated.... So now you have to

fall back on other strategies for dealing with the potential risk. And what is the best strategy? The best strategy is to keep the patient under your control because he has far better chances of being resuscitated if he develops an arrhythmia in the emergency room than he has in the back of an ambulance. This to me is what is surprising in this particular case.

He added that, after Dr. Vázquez told her that the Hospital would not admit the patient, Dr. de León should have said,

"Well, let me tell you something. I am going to keep him here in the emergency room until you show up and ship him out because I don't agree with that. I don't think this patient is a patient that should be shipped out."

Dr. Román Franco also argued strongly that Dr. de León should have given Pérez the "arrythmia preventative" Lidocaine, certainly before placing him in the ambulance; but, he repeated, if this could not be done

you can keep your patient in the emergency room under your control with medication. You can roll in a cardiac monitor. Basically, that is what you do in the intensive care unit [i.e., the coronary care unit].

### Evidence supporting the defendants

The record also contains strong evidence to the contrary. It is uncontroverted that Guadalupe Hospital had a coronary care unit, and that transfer to Guadalupe meant that Pérez could be treated, not in an emergency room, but in that coronary care unit. The record also indicates that Dr. de León transferred Pérez so that he could be looked after, not in an emergency room, but in a coronary care unit. At the same time, plaintiffs' expert Dr. Román Franco conceded on cross examination that it was important to transfer a patient such as Pérez to a coronary care unit as soon as possible, so that specialized staff (staff that the record suggests were *not* present in del Maestro's emergency room) could look after him. Defense counsel read to Dr. Román Franco from a section of a medical book, the "Merck Manual", called "Treatment in the Hospital." It said,

Thus a patient suspected of having an acute M.I. [Pérez's circumstance] should be admitted to a hospital with a cardiac unit as rapidly as possible. On arrival at the hospital the patient should be monitored with portable equipment in the emergency room and a reliable I.V. route should be established. *[He] should be promptly transferred to the C.C.U.* [i.e., the cardiac care unit] without further diagnostic procedures in the emergency area....

Counsel asked Dr. Román Franco

whether you agree with Merck's manual that ... the patient with a heart attack ... should be promptly transferred from the emergency room to the cardiac care unit as rapidly as possible?

Dr. Román Franco replied,

Yes, I will agree with that.

Counsel went on to present Dr. Román Franco with a paragraph from the Harrison Textbook of Internal Medicine, which said

The coronary care unit is a specially designed nursing unit; *the most important feature of which is a staff of highly-trained nursing personnel with authority to take immediate action in emergency situations.*

(Emphasis added.) Dr. Román Franco, in replying to the question of which this statement was a part, did not disagree with the statement. Rather, he affirmed that "if you have a patient that has a pump failure the coronary care unit is the place for him to be." (He added, however, that if "you have a patient with arrythmia [which Pérez did not have at the time he left the hospital, but which he developed in the ambulance]," you should not send him immediately to the coronary care unit, but should "stabilize the patient and then decide what you are going to do.")

Finally, Dr. de León's expert, Dr. Jaime Reteguis Lugo, the medical director of Hospital de la Concepcion, and an expert (with long experience) in the operation of hospital emergency rooms, flatly contradicted Dr. Román Franco's suggestion that

Dr. de León was negligent in transferring Pérez. He concluded that Dr. de León could not have secured Pérez's admission to the coronary care unit at del Maestro (as did Dr. Román Franco). He saw the issue as one of either (1) keeping Pérez in the emergency room at del Maestro, or (2) transferring him to a coronary care unit at Guadalupe. He described the coronary care unit as follows:

> Coronary care is a special unit with a special personnel, special nursing care unit with special training, with special personnel trained in all the insides and all the facts of dealing with heart conditions, managed mainly by those special trained nurses and doctors, of course.

He said,

> It's very important to move the patient as quickly as possible from an emergency room to a coronary unit during—if one has a suspicion, as was in this case, that there is the presentation of an acute myocardial infarction because in emergency rooms you don't have the facilities that you have in a coronary care unit.

And, he concluded unequivocally,

> Well, under the circumstances that Dr. de León had to do with that case, she did as she could. I mean, I would have done the same thing under the same circumstances.

With the record in this state, the parties presented the matter to the jury. The plaintiffs, in closing, argued that Dr. de León was negligent, in part, because

> You do not—I repeat. You do not dump the patient. That is what Mr. David Efron in his opening remarks said to you, this is a patient dumping situation. You do not dump a patient and send a patient elsewhere to another hospital who has a heart attack without oxygen, without giving him a pain killer, without giving him the lidocaine....
>
> How was Dr. de León negligent? She was negligent in not keeping the patient. Everyone said that. She admitted on the stand that she could have kept him. Why? She was in charge of the emergency room. Reinaldo Pérez was no one's patient but hers.

The defense replied that, had Dr. de León *not* transferred Pérez, and had he then died in the emergency room, the plaintiffs would likely have claimed that the decision *to leave him* was negligent. The (hypothetical plaintiffs) according to the defense, would then have said,

> No, the books, Harrison's, Merck, all books say that whenever you have a hard heart infarct the quickest thing you must do is put that patient in the coronary care unit at once. You must do that at once without wasting any time. And, why, if the Guadalupe Hospital which all of you know is some minutes away by car, especially at that hour of the day, from Hospital del Maestro, has an intensive care unit, why did she not transfer him immediately when being told by Dr. Vázquez, the one with power and authority to admit the patient, that the patient could not be admitted because of the policy that had been established by policy? Why did she not transfer ... immediately and did not follow the book?

The defense went on to argue at length that the wise choice for de León was to transfer Pérez to Guadalupe, so that he could be admitted to a coronary care unit.

We can understand how a jury might have decided for the plaintiffs on the basis of this evidence. But the jury did not do this; it decided for the defendant. We do not see how one could say that the jury *clearly* made a mistake. We do not see how one could say that the evidence *overwhelmingly* favored the plaintiffs. Rather, the evidence simply was mixed and contradictory.

The district court wrote that *de León's* own testimony strongly favored the plaintiffs on this issue. We have found in the written record (possibly not available to the district court at the time of decision) that plaintiff's counsel led de León to concede, over and over, that facilities at Guadalupe and del Maestro were "equivalent." But, this concession was continually made in response to questions phrased in terms of comparative *emergency room* facilities. That issue was a red herring. No one claimed Guadalupe had better *emergency*

*room* facilities; the question was whether Pérez needed Guadalupe's *coronary care facilities* compared with the *emergency room* at del Maestro. This red herring, however, might have misled the court. Alternatively, the court may have recalled that de León conceded that del Maestro's emergency room had special heart equipment, but not have recalled that the emergency room seemed to be lacking the key ingredient of a coronary care unit, namely the specially trained nurses and staff. The district court also said that "the jury may not have paid sufficient attention" to the "transfer" matter because its attention was directed to other issues, such as whether or not Lidocaine should be given to a patient with a heart attack who recently was drinking alcohol. The trial, however, was not complicated. It was fairly brief. Though it was held on five different days the transcript is only about 400 pages. The issue is set forth clearly in testimony and by counsel. The district court made no suggestion that any witness lacked credibility. The issue was simply one of the weight of the evidence.

We conclude that the grant of the motion for a new trial was error.

*The judgment of the district court is reversed. The case is remanded with instructions to enter judgment for the defendant.*