**COMFED SAVINGS BANK**

v.

**NEWTOWN COMMONS PLAZA ASSOC.**

Civ. A. No. 87–1203.

United States District Court, E.D. Pennsylvania.

Aug. 15, 1989.

---

David Gutin, Robert Ross, Cohen, Shapiro, Polisher, Shiekman and Cohen, Dean E. Weisgold, Philadelphia, Pa., for plaintiff.

Arsen Kashkashian, Jr., Kashkashian Associates, Philadelphia, Pa., for defendant.

Miles H. Shore, Saul, Ewing, Remick & Saul, Philadelphia, Pa., for Albert Bader.

Ad Hoc Committee of Limited Partners, Edward Rubin, Peter Graeff, Robert Dove, Gerald Hamburg, Robert Zemon and David Weinstein, intervenors, Philadelphia, Pa.

Douglas I. Zeiders, Allen B. Dubroff, Lansdale, Pa., for NCPA and intervenors.

Ira S. Lefton, Reed Smith Shaw & McClay, Philadelphia, Pa., for Unicorn Assoc., intervenors.

## MEMORANDUM

KATZ, District Judge.

On April 25, 1989, I entered an order in the above-captioned case, appointing Michael Schill Auditor for the purpose of determining the exceptions to the proposed schedule of distribution of the proceeds from the sale of that certain piece of property commonly known as Newtown Commons Plaza. Based upon the Stipulation of Uncontested Facts dated May 30, 1989 and signed by the attorneys for each of the interested parties, the record of two days of evidentiary hearings held before the Auditor on July 7 and July 10, 1989, and the Report of the Auditor with Respect to the Exceptions Filed to the Proposed Distribution of Funds from the Foreclosure Sale, I adopt the findings of fact and conclusions of law of the Auditor as follows:

### Findings of Fact

A. *Background Matters*

1. On March 3, 1987, ComFed Savings Bank ("ComFed") filed a complaint in the United States District Court for the Eastern District of Pennsylvania against Newtown Commons Plaza Associates, a Pennsylvania Limited Partnership, Civil Action No. 87–1203.

2. The complaint sought foreclosure of a mortgage held by ComFed on commercial property owned by a limited partnership located in Newtown, Bucks County, Pennsylvania. The property shall hereinafter be referred to as the "Property".

3. An Ad Hoc Committee of Limited Partners of Newtown Commons Plaza Associates (hereinafter referred to as the "Associates") on July 28, 1988 filed a motion to intervene as defendants in the foreclosure action. The intervenors were identified as Edward Rubin, Peter Graeffe, Robert Dove, Gerald Hamburg, Robert Zemon and David Weinstein.

4. The Associates are represented by Douglas I. Zeiders, Esquire.

5. The motion to intervene was granted by the court on August 2, 1988.

6. On August 5, 1988, a judgment in favor of ComFed against Newtown Commons Plaza Associates was entered in the amount of $1,593,424.77. Included in the judgment was the amount of $46,000 attributable to the amount paid by ComFed to Mingroni Roofing for replacement of one of three roofs at the Property. No one present at the hearing before Judge Katz on August 4, 1988 objected to inclusion of the roof replacement expense in the judgment.

7. A writ of execution was issued by the Clerk of Court on September 6, 1988 to direct the U.S. Marshal to levy upon and sell the Property.

8. A marshal's sale of the Property was scheduled for November 8, 1988.

9. Advertising and Sheriff's fees with respect to the scheduled sale equaled $864.36.

10. On November 2, 1988, the Associates filed a motion to vacate judgment, motion to stay marshal's sale of real estate and motion for expedited briefing schedule and hearing.

11. On November 3, 1988, Unicorn Associates, a limited partner, filed a motion for leave to intervene.

12. On November 8, 1988, an Order was entered granting Unicorn Associates leave to intervene and to join in separate motions.

13. After a hearing on November 8, 1988, an order was entered that intervening defendants are granted 60 days to conduct discovery on the motion to vacate judgment, the marshal's sale is stayed until further order and a hearing on the motion to vacate was scheduled for January 11, 1989.

14. After discovery, the motion to vacate judgment was withdrawn at the hearing on January 11, 1989.

15. By order entered on January 12, 1989, the order dated November 9, 1988 staying the marshal's sale was vacated, the U.S. Marshal was ordered to reschedule the sale at the earliest possible date and the judgment in favor of ComFed against the limited partnership was modified to include counsel fees and advertising expenses in-

curred by ComFed since August 3, 1988 in the amount of $49,709.99. According to testimony by Mr. David Gutin, attorney for ComFed, the modified judgment included $2,000 attributable to advertising expenses. The total judgment was therefore increased to the amount of $1,643,134.76.

16. The interest rate in effect on federal judgments on August 4, 1988 was 7.95 percent.

17. The interest rate in effect on federal judgments on January 11, 1989 was 9.20 percent.

18. ComFed rescheduled the marshal's sale of the Property for February 22, 1989 at 1:00 p.m. by notices dated January 18, 1989. The expenses incurred by the sheriff in connection with advertising and serving notice for the planned February 22, 1989 sale equalled $852.12.

19. By letter dated February 16, 1989, Miles H. Shore, Esq., attorney for Albert Bader, an alleged second mortgagee of the property, challenged the Notice of Sale and advertising used by ComFed with respect to the planned February 22, 1989 sale. After consultation with its attorney, ComFed decided to postpone the sale planned for February 22, 1989. Although ComFed and its attorney believed that the notice and advertising were appropriate, they believed that it would be prudent to provide the notice requested by Mr. Shore so as to ensure that the foreclosure sale would be free from legal attack. They also believed that litigating the issue of notice would generate costs in excess of the cost of additional notice and delay.

20. ComFed rescheduled the sale of the Property for March 29, 1989. The sheriff's expenses for advertising and notice in connection with the sale planned for March 29, 1989 were equal to $1,669.35.

21. The sale was rescheduled for a final time to April 5, 1989 due to the failure of the sheriff to serve one of the general partners personally thirty days prior to the date of the planned March 29, 1989 sale. No additional advertising costs were incurred as a result of the postponement to April 5, 1989.

22. The Property was sold on April 5, 1989 by the marshal to John Baylis for $1,751,000. Mr. Baylis closed with the marshal on April 17, 1989. The U.S. Marshal is holding the entire proceeds of the sale in escrow in an interest-bearing account.

23. By letter dated April 6, 1989, ComFed's attorney submitted a Schedule of Proposed Distribution of the proceeds, requesting that the entire proceeds of the sale, after deducting the Marshal's commission, be paid to ComFed.

24. On April 13, 1989, Miles Shore, on behalf of Albert Bader, filed exceptions to the Schedule of Proposed Distribution and requested the appointment of an auditor.

25. On April 14, 1989, Douglas Zeiders, Esq., on behalf of the Associates, filed exceptions to the Schedule of Proposed Distribution.

26. On April 25, 1989, the Honorable Marvin Katz appointed Michael H. Schill, Assistant Professor of Law, University of Pennsylvania Law School, as the Auditor for purposes of determining the exceptions to the proposed schedule of distribution of the proceeds of the sale of the Property.

27. A meeting with the attorneys involved in the matter was held at the University of Pennsylvania Law School on May 10, 1989. Notice of the meeting was sent to all attorneys listed on the district court clerk's docket. Arsen Kashkashian, Jr., Esq. was sent notice of the meeting, which notice was returned to the sender due to an inaccurate address. Upon being notified of the meeting by telephone, Mr. Kashkashian referred all matters concerning the Exceptions to the Proposed Schedule of Distribution to Mr. Zeiders.

28. At the May 10, 1989 meeting it was decided that the matter should be bifurcated. The first segment of the proceeding would require the Auditor to determine the amount of the fund held by the Marshal to which ComFed was entitled. In the event that the fund was not exhausted by ComFed's award and other expenses, a second proceeding would take place to deter-

mine whether the Associates or Mr. Bader was entitled to the surplus.

29. An evidentiary hearing was held on July 7, and July 10, 1989 at which the Auditor heard evidence from several witnesses. All attorneys of record were given notice of the proceeding.

### B. *Management of the Property*

30. Pursuant to a Conditional Assignment of Rents and Leases between James A. Fister, the general partner of Newtown Commons Plaza Associates, and ComFed dated October 2, 1986 (hereinafter referred to as the "Assignment"), Newtown Commons Plaza Associates granted to ComFed an assignment of the rents and leases from the Property as security for the indebtedness of Albert W. Bader.

31. Paragraph 9 of the Assignment provides as follows:

That if any event of default occurs at any time under the Note, Mortgage or any other instrument constituting additional security for the Note, and Assignor fails to cure same within any applicable grace period therein set forth, Assignee may (at its option after service of a Notice) receive and collect when due all such rents, income and profits from the Premises and under any and all Leases of all or any part of the Premises....

32. Paragraph 10 of the Assignment provides as follows:

That Assignor hereby irrevocably appoints Assignee its true and lawful attorney-in-fact, with full power of substitution and with full power for Assignee in its own name and capacity or in the name and capacity of Assignor (from and after the service of a Notice) to demand, collect, receive and give complete acquittances for any and all rents, income and profits accruing from the Premises, and at Assignee's discretion to file any claim or take any other action or proceeding and make any settlement of any claims, in its own name or in the name of Assignor or otherwise, which Assignee may deem necessary or desirable in order to collect and enforce the payment of the rents, income and profits....

33. Paragraph 11 of the Assignment provides as follows:

That Assignee is hereby vested with full power to use all measures, legal and equitable, deemed by it necessary or proper to enforce this Assignment and to collect the rents, income and profits assigned hereunder, including the right of Assignee or its designee to enter upon the Premises, or any part thereof, with or without force and with or without process of law, and take possession of all or any part of the Premises.... Assignor hereby grants full power and authority to Assignee to exercise all rights, privileges and powers herein granted at any and all times (after service of a Notice) without further notice to Assignor, with full power to sue and apply all of the rents and other income herein assigned to payment of the costs of managing and operating the Premises and to payment of all Indebtedness and liability of Borrower to Assignee, including but not limited to: (a) the payment of taxes, special assessments, insurance premiums, damage claims, the costs of maintaining, repairing, rebuilding and restoring the improvements on the Premises or of making the same rentable, reasonable attorney's fees incurred in connection with the enforcement of this Assignment including under the Leases....

34. On May 27, 1988, ComFed delivered letters to the tenants at the Property advising them that ComFed was exercising its rights as assignee under the Assignment and that the tenants must make future rental payments to ComFed.

35. ComFed acted as mortgagee in possession of the Property from the end of May, 1988 until April 17, 1989.

36. ComFed's main office is in Massachusetts.

37. ComFed felt that it could not adequately manage the Property itself since it was not located within close proximity of the Property. ComFed engaged Terry Realty Inc. (hereinafter referred to as "Terry") as manager of the Property. Terry began managing the property in June, 1988

based upon an oral agreement with ComFed. From June, 1988 to August 10, 1988, Terry managed the property without a written agreement, but with the understanding that it would be paid for its services even if a written agreement were never consummated.

38. On August 10, 1988, a Management Agreement was executed between ComFed and Terry. The Management Agreement stated that its term ran from June 15, 1988 to June 14, 1989. Under the Management Agreement, Terry was entitled to a management fee equal to 5 percent "of all rental income collected from the Property...." In addition Terry was to be paid a leasing commission in connection with its activities in leasing the Property, equal to "the sum of (i) 6% of the base rent to be paid under the lease for the first year, (ii) 5% of the base rent to be paid under the lease in connection with the second lease year, and (iii) 4% of the base rent to be paid under the lease in connection with the third and following years." Credible testimony showed that the amounts of the management fee and leasing commission were reasonable and well within the range paid for similar services in the area.

39. Terry provided significant services in managing the Property and leasing office space. At the time Terry was first engaged it found that there were many matters that needed attention ranging from a leaking roof to fire hazards. Terry acted with diligence and care in managing the Property. Terry also secured new tenants for the Property and took steps to retain existing tenants.

40. At the time Terry began managing the Property, the largest single tenant was Scott–Levin, which was operating under a month-to-month tenancy. Due to various maintenance problems which predated Terry's hiring, *see infra* paragraph 42, Scott–Levin was displeased with the management of the Property. Terry arranged for Scott–Levin to enter into a new one year lease at the Property. The lease provided that Scott–Levin would occupy additional space and pay for some of its electrical consumption. Terry was paid a leasing commission

for arranging for the lease. The commission was based upon the rent for the entire premises leased by Scott–Levin, including that portion of the Property it had previously occupied as a month-to-month tenant.

41. Terry was paid a management fee for certain months during which rent was paid by the tenants directly to ComFed.

C. *Roof Replacement*

42. When ComFed became mortgagee in possession, it became aware of numerous problems concerning one of the Property's roofs. ComFed received complaints from tenants concerning water damage caused by repeated leaks. Among the tenants most upset by the roof problems was Scott–Levin, the single largest tenant of the Property. Scott–Levin notified Terry and ComFed that water from the roof had damaged its computer equipment and that air-conditioning problems, which might have been roof-related, had caused them to suffer productivity losses. Terry inspected the premises leased by Scott–Levin and observed water damage. ComFed reasonably believed that Scott–Levin might bring a legal action for the damages it had incurred as a result of the roof problems. It also feared losing Scott–Levin as a tenant of the Property.

43. Terry also inspected the Property and found extensive water damage caused by the leaking roof in locations other than the leased premises of Scott–Levin.

44. ComFed retained National Project Monitors to inspect the roof and solicit bids from three roofing companies to repair or replace the roof. An employee of National Project Monitors inspected the roof and found extensive damage. National Project Monitors received three bids from roofing companies. One offered to patch the roof for $11,800 but would not guarantee its work. Two other roofing companies submitted bids to replace the roof. The bids were $48,940 and $45,000 from the two companies. National Project Monitors recommended that ComFed accept the $45,000 bid from Mingroni Roofing and replace the roof. ComFed accepted the recommendation of National Project Monitors and had

the roof replaced. An amount attributable to the cost of the roof repair ($46,000) was included in the August 5, 1988 judgment of Judge Katz. National Project Monitors was paid $3,200 for its services, which amount was not included in the August 5, 1988 judgment.

45. ComFed's decision to replace, rather than repair, the roof was reasonable under the circumstances. ComFed was concerned that continued roof problems would lead to litigation with Scott–Levin and possibly the loss of the Property's largest tenant. In addition, it justifiably feared that continued leaking of the roof would lead to further damage and deterioration of the Property. Replacement, rather than repair, was necessary because the company that had placed a bid to repair the roof would not guarantee the roof from future problems. ComFed reasonably relied upon National Project Monitors's recommendation to replace the roof.

### D. Forgiveness of Rent

46. When ComFed went into possession of the Property, the largest tenant, Scott–Levin, was disenchanted with the management of the building. Scott–Levin claimed that its equipment had been damaged by the leaking roof and that problems with the air conditioning system required it to send its employees home early on several occasions. See supra paragraph 42. Scott–Levin had withheld its rent for June, July and August 1988. ComFed and Terry made diligent efforts to collect the back rent and address Scott–Levin's legitimate concerns. Based upon its consultation with Terry and its attorneys, ComFed reasonably determined that certain of Scott–Levin's claims had merit. ComFed was also concerned that legal action against Scott–Levin to recover back rent might lead its largest tenant to terminate its month-to-month tenancy. Therefore, ComFed and Scott–Levin agreed that Scott–Levin would pay one-half of the delinquent rent ($10,723.42), with the remainder being forgiven.

47. After consummation of this agreement, Scott–Levin made prompt rent payments and executed a new one year lease.

ComFed's actions with respect to Scott–Levin were both prudent under the circumstances as well as successful in preserving and enhancing the tenancy.

### E. Failure To Collect Rent From Atlantic–Financial

48. At the time ComFed took over possession in 1988, Atlantic Financial was one of the tenants of the Property. Although Atlantic Financial was not physically present at the Property, it continued to make lease payments in the amount of $970 per month. In December, 1988, ComFed secured a lease termination from Atlantic Financial and rented the recovered space to Scott–Levin as of January, 1989.

49. ComFed's Cash Flow Analysis fails to show rent payments by Atlantic Financial for the months of October, and December, 1988. It is reasonable that no December rent was paid on the premises that had been leased to Atlantic Financial since that portion of the Property would soon be leased to Scott–Levin. It is not unreasonable or unusual to hold space vacant for a short period of time to make it ready for new tenants.

50. ComFed did not act prudently with respect to collection of the October, 1988 rent from Atlantic Financial. Testimony indicated that ComFed did not have the Atlantic Financial lease and failed to make reasonable efforts to obtain the lease. As of July 10, 1989, ComFed was uncertain as to what the term of the lease was and why it was unable to account for October, 1988 rent from Atlantic Financial.

### F. Expenses Incurred After April 1, 1989

51. Terry made certain payments in April, May, and June, 1989 for expenses incurred in conjunction with its management of the Property.

52. All of the tenants paid their rent to Terry for the month of April, 1989 except for America Corp., which had a practice of paying its rent at the end of the month. ComFed did not prorate any of the rent it received for April with the purchaser of the Property.

53. ComFed had monthly service contracts with certain companies which provided trash collection, cleaning, extermination and landscaping services for the Property. These contractors provided services at the Property for the month of April and were paid by ComFed. Some of the services were provided after the date the purchaser at the foreclosure sale closed on the Property. ComFed did not prorate the expenses of operating the Property during the month of April with the purchaser of the Property. In light of the fact that ComFed did not divide the revenue it received for April with the purchaser, it acted reasonably in not prorating the expenses. ComFed was concerned that if it sought to prorate both revenue and expenses, the purchaser would request a payment from ComFed for real property taxes which were not yet due, but which were attributable to ComFed's period of ownership. It is likely that a proration of all revenue and expenses would thus have resulted in less net revenue to ComFed from operation of the Property than would ComFed's paying all April, 1989 expenses and retaining all April, 1989 rent.

54. ComFed's expenses for maintenance and repair were comparatively high during April, 1989, the month it sold the Property. With one exception, each of these expenditures was reasonable. In particular, the payments to Scott's Emergency Lighting, Keith's Mobile Lock Shop and Hallmark Contemporaries were for work completed in March, and April, 1989. Much of the work was necessitated by Terry's reasonable concern that the condition of the Property might violate applicable health and safety regulations. Most of the work was ordered prior to March, 1989.

55. The landscaping expenditures in April, 1989 were planned several months earlier and were incurred in conjunction with the erection of a sign at the Property. According to uncontradicted testimony, landscaping was required to meet township regulations.

56. ComFed paid for certain expenditures after the date the Property was sold at foreclosure sale. With the exception of attorney's fees which are addressed in *in-fra* paragraphs 58–60, the payments relate to services provided or ordered prior to the transfer of the property and were reasonable.

57. ComFed's report of its expenditures for April, 1989 includes a bill in the amount of $150 for services provided by Harvey D. Spencer. The face of the bill reveals that services were also provided by Mr. Spencer at another building managed by Terry. Based upon evidence presented at the evidentiary hearing, it is impossible to determine how much of the $150 payment is attributable to services provided at the Property.

G. *Attorney's Fees*

58. Paragraph 23 of the Mortgage–Security Agreement executed by Newtown Commons Plaza Associates on October 2, 1989 provides as follows:

> If Mortgagee commences an action against Mortgagor or otherwise incurs expenses to enforce any of the terms hereof, or because of breach by Mortgagor or [sic] any of the terms hereof, or for the recovery of any sum secured hereby, or to protect its rights hereunder, Mortgagor shall pay to Mortgagee attorney's fees and expenses incurred by Mortgagee, and the right to such attorney's fees and expenses shall be enforceable whether or not any action is actually commenced against Mortgagor, and if commenced whether or not any such action is prosecuted to judgment. This Mortgage shall secure Mortgagor's obligation to repay such costs and expenses.

59. In judgments entered on August 5, 1988 and January 12, 1989, Judge Katz awarded ComFed a total of $94,787.25 in attorney's fees.

60. Since January 12, 1989, ComFed has paid $20,071.39 in attorney's fees attributable to services rendered in connection with the Property. Based upon testimony at the evidentiary hearing and my examination of ComFed's legal bills, I conclude that of this amount, $6,575.83 in attorney's fees were for legal services rendered after the date the purchaser closed on· the Property.

## H. *Marshal's Commission*

61. The U.S. Marshal's commission for its services in connection with the foreclosure sale is $26,280.00.

## I. *Accounting*

62. ComFed has submitted a Cash Flow Analysis of its revenues and expenditures from its time as mortgagee in possession. ComFed claims that it has incurred a negative cumulative cash flow of $26,966.59 from its operation of the Property.

### *Conclusions of Law*

## A. *Jurisdiction*

1. Jurisdiction of this matter is based on the parties' diversity of citizenship. *See Comfed Savings Bank v. Newtown Commons Plaza Associates*, No. 87–1203, slip op. at 8, 1988 WL 82840 (E.D.Pa. August 4, 1988).

## B. *Management of the Property*

2. A mortgagee in possession "must manage the property in a reasonably prudent and careful manner so as to keep it in a good state of preservation and productivity." *Myers–Macomber Engineers v. M.L.W. Construction Corp.*, 271 Pa.Super. 484, 489, 414 A.2d 357, 360 (1979). A mortgagee in possession has a duty to make those repairs which are reasonably necessary to keep the mortgaged property in good condition and prevent its deterioration and is entitled to reimbursement for expenses so incurred. *See Landau v. Western Pennsylvania National Bank*, 445 Pa. 217, 223, 282 A.2d 335, 339 (1971); *Stern v. Sanet*, 169 Pa.Super. 448, 450–51, 82 A.2d 511, 513 (1951); *Appeal of Harper*, 64 Pa. 315, 321 (1870). Failure by the mortgagee in possession to maintain the property may expose it to liability. *See Central Pennsylvania Savings Ass'n. v. Carpenters of Pennsylvania, Inc.*, 502 Pa. 17, 23, 463 A.2d 414, 417 (1983); *Sansotta v. City of Pittsburgh*, 330 Pa. 199, 201, 199 A. 164 (1938).

3. As I have indicated in my Findings of Fact, I find that with the exception of its failure to collect one month's rent from Atlantic Financial and its payment of the invoice from Harvey D. Spencer out of rents from the Property, ComFed's actions as mortgagee in possession were reasonably prudent and careful. Upon taking possession, ComFed found that it could not manage the Property from Massachusetts and therefore hired Terry. Terry provided competent management services and charged management fees and leasing commissions that were reasonable. Although if ComFed had itself managed the Property it would likely have been prohibited from charging a management fee for its services based upon a percentage of rentals, *see Winthrop v. Arthur W. Binns, Inc.*, 160 Pa.Super. 214, 217–18, 50 A.2d 718, 719–20 (1947), ComFed did not and could not have managed the Property itself. The leasing commissions and management fees earned by Terry were reasonable, justifiable and should be treated in a manner similar to other costs of operating the building.

This case is easily distinguishable from *Winthrop, supra.* In *Winthrop*, the Superior Court held that the mortgagee in possession could not charge a five percent commission to reimburse itself for its management efforts. The court found that there was no express agreement permitting the fee. The court also quoted a paragraph from a treatise which stated that even if such an agreement existed, a management fee payable to the mortgagee would be unenforceable since it would "tend directly to facilitate usury and oppression." *Winthrop*, 160 Pa.Super. at 217, 50 A.2d at 719 (quoting from 2 Jones on Mortgages § 1449). In the instant case, paragraph 11 of the Assignment expressly authorizes ComFed to apply the rents to the cost of maintaining the Property. In addition, unlike the case in *Winthrop*, the management fees and leasing commissions were paid to an independent contractor rather than the mortgagee. Thus the fees and commissions did not increase the return to ComFed and therefore could not lead to usury. I have also found that the fees were reasonable and not oppressive. *See also* G. Nelson & D Whitman, *Real Estate Finance Law* 218 (2d ed. 1985) (although mortgagee may not be permitted to

charge a fee for its management services, it may employ a third party and charge the expenses to the mortgagor).

Based upon my finding that the engagement of Terry was prudent and that the amounts of the management fees and leasing commissions were reasonable, ComFed is entitled to credit all of its expenditures for these purposes against the rents from the Property.

■ 4.  Terry earned a management fee for certain months in which rent was paid directly to ComFed.  In addition, Terry was paid a management fee for the period June 15, 1988 to August 10, 1989 during which time a written management agreement had yet to be executed.  Both of these payments to Terry were justified.  During June, and July, 1988, Terry operated under an oral agreement with ComFed.  Terry provided significant management services in connection with the Property beginning in June, 1989 for which it was entitled to compensation.  Its services were far more extensive than collecting the rent.  Although its management fee was calculated based upon rent revenue, its fee was compensation for management services, not mere rent collection.

■ 5.  ComFed was also justified in paying to Terry a leasing commission based upon the Scott–Levin lease.  Although Terry did not initially procure Scott–Levin as a tenant at the Property, Scott–Levin's lease had expired and there was a distinct possibility that Scott–Levin would terminate its month-to-month tenancy.  Terry arranged for a new lease to be executed with Scott–Levin for expanded premises and therefore under the Management Agreement earned and was entitled to the leasing commission.

6.  ComFed is not required to add to its Cash Flow Analysis the $10,723.42 in rent it agreed to forgive with respect to Scott–Levin.  As I have indicated in my Findings of Fact, the decision to agree to forgive one-half of the rent that was being withheld by Scott–Levin was justified, reasonable and prudent.  Furthermore, paragraph 10 of the Assignment expressly authorizes ComFed "to give complete acquittances for any and all rents ... and at Assignee's

discretion to file any claim or take any other action or proceeding and make any settlement of any claims ... which Assignee may deem necessary or desirable...."

■ 7.  ComFed's decision to replace one of the Property's roofs was also reasonably prudent under the circumstances.  Reimbursement from the rents of costly improvements made by a mortgagee in possession are not always permitted.  *See Appeal of Harper*, 64 Pa. 315, 321 (1870).  Nevertheless a mortgagee in possession may be credited for reasonable improvements which preserve the mortgaged property from dilapidation and decay and which are reasonable in light of "the justice and equity arising out of the circumstances." *Wells v. Van Dyke*, 109 Pa. 330, 334 (1885).  *See also Appeal of Harper*, 64 Pa. at 321; G. Nelson & D. Whitman, *supra*, at 214–15.  Based upon my finding that the roof replacement was reasonably necessary to prevent the building's further deterioration and to retain tenants, justice and equity lead me to find that ComFed is entitled to credit against the rents from the Property the $45,500 paid to Mingroni Roofing as well as the $3,200 paid to National Project Monitors.  This finding is further buttressed by the express authorization given to ComFed under paragraph 11 of the Assignment to apply the rents from the Property to "the costs of maintaining, repairing, rebuilding and restoring the improvements at the Premises...."

Even if I were to have found that the roof expenditure was unreasonable under the circumstances, I have significant doubt that the credit to ComFed could be challenged in this proceeding.  The cost of the new roof was included in the original judgment entered by Judge Katz on August 5, 1988.  No one at that proceeding objected to its inclusion and the judgment has not been vacated or reopened.  Nevertheless, my finding that the roof expenditure was reasonably necessary and prudent makes further discussion of my authority with respect to evaluating the August 5, 1988 judgment moot.

8. ComFed did not act prudently in failing to collect one-month's rent from Atlantic Financial. Therefore, its negative cumulative cash flow should be reduced by $970.

9. With one exception, ComFed's expenditures after March 30, 1989 in connection with the Property were reasonably necessary. ComFed is therefore entitled to credit these expenses against the rent it received from the Property. Nevertheless, in April, 1988, Terry, on behalf of ComFed, paid an invoice from Harvey D. Spencer in the amount of $150. ComFed did not act prudently in permitting the payment of this invoice since it included work done for a different property managed by Terry. Since there is no way to determine from the invoice or the testimony presented what portion of the $150 expense was attributable to the Property, the entire amount must be disallowed. Therefore the negative cumulative cash flow of ComFed must be reduced by $150.

### C. *Advertising Expenses*

■ 10. As my Findings of Fact indicate, ComFed acted in a reasonably prudent manner in postponing the sale of the Property scheduled for February 22, 1989. Mr. Shore, on behalf of Albert Bader, an alleged second mortgagee of the Property, had challenged the notice of the sale. Although ComFed contends that its notice was sufficient, it felt that it was more prudent to postpone the sale so as to accommodate Mr. Shore's objections. Postponing the sale increased the likelihood that a purchaser would not be dissuaded from purchasing the Property based upon the fear that the sale might later be set aside. In addition, ComFed reasonably felt that the costs of postponing the sale would be less than the cost of litigating the issue of notice.

Pennsylvania Rules of Civil Procedure provide for the stay of execution of judgments based upon the written direction of the plaintiff to the Sheriff. *See* Pa.Rul.Civ. Proc. 3121, 3183 (Purdons, 1987). Neither the rule, nor any caselaw, requires that the increased advertising costs attributable to the postponement be borne by the party who requested the stay. Instead the parties seeking to invalidate the increased advertising costs and postjudgment interest, *see infra* paragraph 15, request that I base my decision on equitable principles. I find that no equitable consideration justifies denying to ComFed any of the advertising expenses it incurred. The challenge to the notice came from one of the parties to this proceeding. Regardless of whether the challenge was meritorious, its effect was to cloud the foreclosure sale. ComFed acted prudently and in good faith in postponing the sale. ComFed did not postpone the sale because it sought to benefit from the delay. To the contrary, all evidence submitted to the Auditor indicates that ComFed has consistently acted to expedite the proceedings concerning the Property. Therefore, ComFed is entitled to credit against the rents collected from the Property the full $3,385.83 in advertising costs.

### D. *Postjudgment Interest*

■ 11. Post-judgment interest in federal court cases whose jurisdiction is based upon diversity of citizenship is governed by 28 U.S.C. § 1961 (1982 & Supp. V) rather than by state law. *See Nissho–Iwai Co., Ltd. v. Occidental Crude Sales, Inc.*, 848 F.2d 613, 622 (5th Cir.1988) ("We agree with the eighth, tenth and eleventh circuits which have expressly held that the amended federal postjudgment interest statute applies in diversity cases."); *Travelers Insurance Co. v. Transport Insurance Co.*, 846 F.2d 1048, 1053 (7th Cir.1988) (postjudgment interest is governed by federal law); *Weitz Co., Inc. v. Mo–Kan Carpet, Inc.*, 723 F.2d 1382, 1386 (8th Cir.1983) (*Erie* doctrine does not require that state law apply with respect to postjudgment interest).

12. ComFed is entitled to postjudgment interest at the rate of 7.95 percent on its $1,593,424.77 judgment which was entered on August 5, 1988. The interest should be calculated for a period commencing on August 5, 1988 and ending on April 17, 1989. The interest payable pursuant to § 1961 on the August 5, 1988 judgment is $88,847.62.

13. ComFed is entitled to postjudgment interest at the rate of 9.20 percent on the amount of $49,709.99 that was added to its original judgment in an order entered on January 12, 1989. The interest should be calculated for a period commencing on January 12, 1989 and ending on April 17, 1989. The interest payable pursuant to § 1961 on the amount added to the August 5, 1988 judgment is $1,202.85.

14. ComFed has argued that the January 12, 1989 judgment increasing its earlier judgment by $49,709.00 entitles it to postjudgment interest on the entire modified judgment of $1,643,134.76 at the 9.20 percent rate in effect on January 11, 1989 for the period January 12, 1989 to April 17, 1989. I find that ComFed is not entitled to earn interest at the increased rate on the amount of the August 5, 1988 judgment. In amending 28 U.S.C. § 1961, "Congress expressed its desire to establish a realistic and nationally uniform rate of interest on judgments in the Federal courts' to eliminate the incentive for delaying payment of judgments and for filing frivolous appeals...." *Nissho–Iwai Co.*, 848 F.2d at 623 (quoting S.Rep. No. 275, 97th Cong., 2d Sess. 11). To achieve this purpose the successful litigant should be entitled to interest in an amount roughly similar to the amount it could earn if it received and invested the proceeds of the judgment on the date the judgment was entered. This purpose is achieved by awarding interest on the original judgment at the rate applicable on August 5, 1988. The fact that its judgment was subsequently increased to reflect attorneys fees does not entitle ComFed to take advantage of the market change in interest rates. Litigants should not be entitled to an adjustment of the interest rates on previously awarded judgments each time their judgments are modified or amended. One can see even more clearly why such a change in interest rate would be unjustified by examining a hypothetical case. Suppose that the interest rate on federal judgments had *fallen* from the time of the original judgment, rather than risen. If the defendant in this case requested that the original judgment earn interest at the hypothesized lower interest rate in effect on the date of the modified judgment, surely such a request would not be granted since that would provide an incentive for the defendant to delay the proceedings, thereby frustrating the policies underlying 28 U.S.C. § 1961.

15. The Associates and Mr. Bader challenge ComFed's entitlement to postjudgment interest after the date of the postponed February 22, 1989 sale. They argue that ComFed was at fault in postponing the sale and that equitable principles justify not granting ComFed postjudgment interest after the date of the scheduled sale. As was the case with respect to advertising costs, the parties rely upon equitable principles rather than caselaw. I find, as I found with respect to advertising costs, *see supra* paragraph 10, that ComFed acted reasonably and in good faith in postponing the sale and that neither the Pennsylvania Rules of Civil Procedure, 28 U.S.C. § 1961, nor caselaw interpreting these two bodies of law supports the claim that the postponement justifies a forfeiture of postjudgment interest.

### E. *Attorney's Fees*

16. ComFed claims that it is entitled to attorney's fees in the amount of $20,571.39. These fees were paid by ComFed after the January 12, 1989 judgment. Of this amount, $6,575.83 is attributable to legal services provided after the date on which the foreclosure sale purchaser closed on the Property. I find that the $6,575.83 expenditure for attorney's fees rendered after April 17, 1989 is not a cost that may be credited against the rents and profits from the Property. Paragraph 23 of the Mortgage–Security Agreement provides that the mortgagor will pay all legal fees incurred by ComFed in connection with actions by ComFed to enforce the terms of the Mortgage–Security Agreement. Paragraph 23 also provides that the Mortgage–Security Agreement "shall secure Mortgagor's obligation to repay such costs and expenses." ComFed is entitled to apply the proceeds from the security for its loan (ie. the Property and the rents and profits from the Property) to its reasonable

costs and expenses while it is a mortgagee. Therefore ComFed is entitled to credit against the rents and profits from the Property legal fees in the amount of $14,485.51. Nevertheless, after April 17, 1989, ComFed was no longer the mortgagee with respect to the Property since the mortgage had been foreclosed and the security sold. The Mortgage–Security Agreement secured the legal expenses incurred by ComFed during its existence, but could not secure expenses once it had ceased to exist. ComFed may not credit the legal fees of $6,575.83 against the rents and profits generated by the Property or the proceeds from the sale of the Property. Therefore the negative cumulative cash flow of ComFed should be reduced by $6,575.83.

### F. Conclusion and Proposed Distribution

17. The funds available for distribution in this matter amount to $1,751,000. They are being held by the U.S. Marshal. Of this amount, the U.S. Marshal is entitled to $26,280 as a commission for its services. In addition, under the April 25, 1989 order by Judge Katz, the fee charged by the Auditor is to be paid from the fund.

18. ComFed's judgment is equal to $1,643,134.76. ComFed is entitled to post-judgment interest on its judgment in the amount of $90,050.47.

19. In addition to the amounts included in the August 5, 1988 and January 12, 1989 judgments, ComFed has incurred a cumulative negative cash flow from operating the Property in the amount of $19,270.76. This amount is arrived at by reducing the cumulative negative cash flow claimed by ComFed of $26,966.59 by the following: (1) $970 in rent attributable to Atlantic Financial which ComFed should have made greater effort to collect, (2) $150 payment to Harvey D. Spencer which included work attributable to another property and (3) $6,575.83 in attorney's fees for services rendered after the date the purchaser at the foreclosure sale closed on the Property.

20. ComFed also incurred $1,385.83 in advertising expenses that were not included in either the August 5, 1988 or January 12, 1989 judgments.

21. ComFed is therefore entitled to the sum of $1,753,841.82.

22. After deduction of the Marshal's commission and the Auditor's fee, an insufficient amount of money will remain in the fund to reimburse fully ComFed. Therefore, after distributing $26,280 to the marshal and the Auditor's fee to the Auditor, ComFed is entitled to whatever moneys remain in the fund. No funds remain for distribution to either Mr. Bader or the Associates.