**In the Matter of MONNIG'S DEPART-MENT STORES, INC., Debtor.**

**MONNIG'S DEPARTMENT STORES, INC., and Signal Capital Corp., Appellees,**

**v.**

**AZAD ORIENTAL RUGS, INC., Appellant.**

**No. 90–1628**
**Summary Calendar.**

United States Court of Appeals, Fifth Circuit.

April 23, 1991.

Gregory A. Whittmore, Taylor & Mizell, Dallas, Tex., for appellant.

Joe Colvin, Gilbert & Colvin, Fort Worth, Tex., for Monnig's Dept. Stores, Inc.

Vernon O. Teofan, Larry Chek, Jenkens & Gilchrist, Dallas, Tex., for Signal Capital Corp.

Before KING, GARWOOD, and DUHÉ, Circuit Judges.

GARWOOD, Circuit Judge:

Appellant Azad Oriental Rugs, Inc. (Azad) appeals from the district court's reversal of the bankruptcy court's order imposing a constructive trust against Monnig's Department Store (Monnig's), as debtor-in-possession, and Signal Capital Corporation (Signal). We affirm the district court.

### Facts and Proceedings Below

Until late 1988, Monnig's was a department store with locations in Fort Worth and Tarrant County, Texas. On March 20, 1986, Monnig's entered into a licensing agreement with Azad, whereby Azad was granted the right to use space in Monnig's stores for the sale of oriental rugs in exchange for a commission consisting of 12% of Azad's net sales. The license agreement expired on April 1, 1988, but was renewed on a month-to-month basis by agreement of the parties. All rugs were purchased by Azad and were considered by both Azad and Monnig's to be inventory of Azad; further, Azad was required to provide insurance for damage or liability resulting from the presence of Azad's rugs in Monnig's stores.

Under the terms of the license agreement, Azad was to make all sales in Monnig's name and, if the sales were on credit, to use Monnig's credit card charge slips. Each sale of an Azad rug was distinguishable from other sales at Monnig's by a unique department number (7010), an Azad employee number (9999), and a brief description of merchandise sold. At the end of each business day, Azad employees were required to remit to Monnig's all cash and charge slips received from sales of Azad's rugs.[1] Thereafter, on the 20th day of the following month, Monnig's was required to make payment to Azad in an amount equal to Azad's net sales *less* applicable sales and excise taxes, and Monnig's 12% commission.[2] However, neither the terms of the agreement nor the parties' operations under it restricted in any way Monnig's use of the funds. It was not required, for instance, that Monnig's hold, deposit or disburse the funds in any particular fashion, nor did Monnig's do so, as Azad was plainly aware. Monnig's was not required to and did not segregate the Azad funds, as Azad must have known, nor did Monnig's ever represent that those exact funds would be used for any particular purpose. Monnig's billed and collected on all accounts generated by charge slips remitted daily to it by Azad, and retained all of the proceeds thereof when received, commingling those funds with proceeds from other sales. In the event of an uncollectible account, Monnig's bore the risk of loss. Cash sales of Azad rugs were rung up on the same Monnig's cash registers used for sales of other items, and the cash received was placed in the register and immediately commingled with cash there from the sale of Monnig's items. All proceeds of Azad rug cash and

---

1. Paragraph 6 of the license agreement provided as follows:

   "6. All receipts from the Licensee's [Azad's] operation shall be turned over to Licensor [Monnig's] at the end of the business day according to the method usually employed by Licensor and shall be held by the Licensor subject to payment as provided in paragraph seven of this agreement. All sales shall be made in the name of the Licensor and shall be recorded on sales forms or other media similar to those used by Licensor in its other departments. Licensor agrees to keep a true and accurate account of all sales transactions received and disbursed which results from Licensee's operations. Both parties shall have the right at reasonable times to examine the other's records relating to the periodic settlements as hereinafter provided. Licensee agrees to accept for credit the full merchan-

   dise value of all expired layaway transactions."

2. Paragraph 7 of the license agreement provided as follows:

   "7. At the end of each fiscal month, Licensor shall prepare a statement setting forth the net of the total amount of Licensor's net sales during the month, to be computed in the manner herein provided. Licensor shall retain a sum equal to the percentages of net sales as agreed upon in paragraph four (4). Such statements shall further set forth the total amount of expenditures made by the Licensor for the account of the Licensee during such month, and the total amount of such expenditures which shall be retained by Licensor. The balance of the net sales, after which deductions have been made, shall be payable by the Licensor to Licensee on the 20th day of the following month."

credit sales were deposited in the same Monnig's bank accounts in which proceeds of sales of Monnig's merchandise, and other Monnig's receipts, were deposited, all without any segregation.

With respect to the operation of Azad's rug department, Monnig's retained the power to direct the time and place of the rug sales. Additionally, Monnig's retained the power to control the manner of Azad's sale of the rugs; to approve the selection of all persons employed by Azad to sell rugs in Monnig's stores; and to supervise the work of Azad's employees. Monnig's actually exercised these control powers.

Other than executing the license agreement with Monnig's, Azad took no action whatever to establish or perfect any lien or claim respecting Monnig's.

Several months after Monnig's entered into the licensing arrangement with Azad, Monnig's and Signal entered into a loan and security agreement, which granted Signal a security interest in Monnig's accounts. Under the terms of the security agreement, Monnig's was required to submit a list of accounts receivable to Signal in order to draw down on its revolving loan with Signal. Generally, Monnig's was permitted to borrow under the security agreement up to 85% of eligible accounts. Routinely included within the list of accounts receivable were accounts representing the sale of Azad's rugs.

Monnig's deteriorating financial condition caused it to file a petition in bankruptcy pursuant to chapter 11 of the bankruptcy code on June 9, 1988. Thereafter, Monnig's operated its stores as a debtor-in-possession for approximately six months. Subsequent to the filing, Monnig's failed to make any payments to Azad under the license agreement for sales made by Azad during May and June, 1988. In fact, evidence adduced before the bankruptcy court below indicated that Monnig's spent all of the disputed Azad-related funds for business expenses prior to the petition date. The net amount still outstanding and due, as stipulated by the parties, is $35,008.97, representing $14,062.67 due respecting

charge sales and $20,496.30 respecting cash sales.

On June 20, 1988, Azad filed an adversary proceeding in the bankruptcy court demanding turnover of the outstanding proceeds or imposition of a constructive trust upon the cash and proceeds of accounts arising from Azad's rug sales. The case was tried to the bankruptcy court on briefs, stipulated facts, and the testimony of Monnig's president, Mr. Ralph Cook, on March 9, 1989. The bankruptcy court entered its order and reasons on March 28, granting judgment against Monnig's and Signal in the amount of $35,008.97 based on the court's imposition of a constructive trust against the defendants. Signal promptly filed a motion to amend pursuant to Bankruptcy Rule 7052(b), which was denied by the bankruptcy court on November 3, 1989.

Monnig's and Signal appealed the judgment of the bankruptcy court to the district court below. On June 29, 1990, the district court reversed the judgment of the bankruptcy court on the ground that it had improperly imposed a constructive trust under the facts of the case. The district court declined, however, to rule on the priority of Signal's security interest. Azad timely appealed the district court's order, seeking to reinstate the bankruptcy court's imposition of a constructive trust, and also arguing that Signal's security interest in accounts did not attach to Azad's sales proceeds.[3] We affirm the district court's judgment.

## Discussion

### I.

On appeal from a judgment in bankruptcy, findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses. *See Richmond Leasing Co. v. Capital Bank N.A.*, 762 F.2d 1303, 1308 (5th Cir.1985). The burden of establishing that a determination is clearly

---

**3.** Neither Signal nor Monnig's have appealed     the district court's judgment.

erroneous is stringent; to so conclude, a reviewing court must have a "firm and definite conviction that a mistake has been committed." *Wilson v. Huffman (In re Missionary Baptist Foundation of America )*, 712 F.2d 206, 209 (5th Cir.1983) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). The rigorous standard applied to review of findings of fact does not, however, apply to the bankruptcy court's conclusions of law, which are subject to plenary review. *In re Missionary Baptist,* 712 F.2d at 209.

## II.

Azad's primary argument in this appeal is that the bankruptcy court correctly imposed a constructive trust respecting the amount Monnig's owed Azad as net proceeds from Azad's rug sales. We disagree.

### A. Requisites of a Constructive Trust

█ The controlling law with respect to imposition of a constructive trust in this case is that of Texas. Under Texas law, a constructive trust "is an equitable remedy created by the courts to prevent unjust enrichment." *Hudspeth v. Stoker,* 644 S.W.2d 92, 94 (Tex.App.—San Antonio 1982, writ ref'd). Unlike trusts usually encountered under conventional trust doctrine, constructive trusts are not created by an express agreement. *Omohundro v. Matthews,* 161 Tex. 367, 341 S.W.2d 401, 405 (1960). Rather, a constructive trust is an equitable device "imposed by law because the person holding the title to property would profit by a wrong or would be unjustly enriched if he were permitted to keep the property." *Id.*

Where, as here, there is no formal trust in the traditional sense nor any special legal relationship between the parties, Texas courts generally require the following three elements before applying the equitable remedy of a constructive trust:

(1) Breach of an informal relationship of special trust or confidence arising prior to and apart from the transaction in question, or actual fraud. *See, e.g., Meadows v.*

*Bierschwale,* 516 S.W.2d 125, 128 (Tex. 1974);

(2) Unjust enrichment of the wrongdoer. *See, e.g., Hudspeth v. Stoker,* 644 S.W.2d 92, 94 (Tex.App.—San Antonio 1982, writ ref'd); and

(3) Tracing to an identifiable res. *See, e.g., Meadows, supra,* at 129; *Peirce v. Sheldon Petroleum Co.,* 589 S.W.2d 849, 853 (Tex.Civ.App.—Amarillo 1979, no writ). *See also, In re Kennedy & Cohen, Inc.,* 612 F.2d 963, 966 (5th Cir.1980) (federal law requires tracing of funds regardless of the state law requirements), *cert. denied sub nom. Wisconsin v. Reese,* 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980).

### B. Breach of Fiduciary Relationship

█ In order to justify imposing a constructive trust on property, fraud—either actual or constructive—must be present. *Talley v. Howsley,* 142 Tex. 81, 176 S.W.2d 158, 160 (1943). Actual fraud usually involves a dishonest purpose or an intent to deceive, while constructive fraud usually involves a breach of trust or confidential relationship. *Archer v. Griffith,* 390 S.W.2d 735, 740 (Tex.1964). Confidential relationships arise not only from technical fiduciary relationships, but also from partnerships, joint ventures, and other informal relationships. *Thigpen v. Locke,* 363 S.W.2d 247, 253 (Tex.1962).

█ This Court discussed the relationship necessary (absent actual fraud) for imposition of a constructive trust under Texas law in *Harris v. Sentry Title Co., Inc.,* 715 F.2d 941 (5th Cir.1983), *modified on other grounds,* 727 F.2d 1368 (5th Cir. 1984), *cert. denied sub nom. Ward v. Sentry Title Co.,* 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984). The *Harris* court observed:

"In recognizing a constructive trust, the critical requirement for purposes of this case is that the parties have a confidential or fiduciary relationship *prior to and apart from the transaction in question.* This relationship may be established through prior joint business ventures, or other types of close, confidence-inducing relationships. It need not arise from a

strict, formal fiduciary relationship. However, mere subjective confidence among business associates or the like is insufficient to support a constructive trust." *Harris*, 715 F.2d at 946 (citations omitted) (emphasis added). Whether on undisputed facts a relationship of trust or confidence is sufficiently prior to and apart from the transaction in question to support imposition of a constructive trust is a question of law. *Id.* at 948.

The bankruptcy court found that Monnig's and Azad had a fiduciary relationship based on the parties' principal/agent relationship. This finding was apparently premised on Monnig's control over Azad's operations on the premises of Monnig's as well as the retention by Monnig's of sales proceeds and the duty to account for sales. We agree with the district court that this factual finding was not clearly erroneous. However, as there was no evidence or finding of actual fraud, the burden was on Azad to prove by a preponderance of the evidence "that the parties had a long-standing fiduciary or confidential, trusting relationship *unrelated to the subject transaction.*" *Harris*, 715 F.2d at 948 (emphasis added). In modifying its decision, the *Harris* court made clear its understanding that Texas courts, in the absence of fraud, place almost controlling emphasis upon the requirement that there be a *pre-existing* confidential relationship between the parties *before* the transaction or the series of related transactions in question. *Harris*, 727 F.2d at 1370. Although the evidence in this case showed that the parties dealt with each other for about 27 months, the relationship had its basis only in and solely concerned the license agreement. Accordingly, it would appear that the dealings between Azad and Monnig's have not been shown to be sufficiently long-standing and confidential as to engender the character of relationship necessary to impose a constructive trust.

■ In any event, even if the necessary fiduciary relationship existed, there has been no showing of breach thereof. An analogous case, often-cited by bankruptcy courts in their discussion of constructive trusts, is *In re Penn–Dixie Steel Corp.*, 6 B.R. 817 (Bankr.S.D.N.Y.1980); *aff'd* 10 B.R. 878 (S.D.N.Y.1981). The facts in *Penn–Dixie* involved a shipper who utilized a carrier to transport its steel to customers. It appears that under the arrangement the shipper-debtor served as a conduit between the carrier and the customers. The customers prepaid the shipping charges to the debtor, who deposited the money received in its general bank account and used that money to pay the carrier. The carrier asserted that it had an equitable claim to the funds in the debtor's general account because those funds were, at least partially, the result of the payment of shipping charges. The bankruptcy court refused to impress a constructive trust and held instead that the carrier possessed a general unsecured claim. In its decision, the bankruptcy court observed that generally "when the circumstances are such that the recipient of the funds is entitled to use them as his own and can commingle them with his own moneys, a debtor-creditor relationship exists, not a trust." *In re Penn–Dixie Steel Corp.*, 6 B.R. at 823–24 (citing 4A *Collier on Bankruptcy* (15th Ed.) ¶ 541.13 at 541–67). *See generally,* I *Scott on Trusts* § 12 at 103–139.

Similarly, the evidence in the record before us shows that the agreement between Azad and Monnig's did not require a separation of funds by Monnig's. Rather, the license agreement merely required Azad to turn over all receipts from Azad's business to Monnig's according to the method usually employed by Monnig's, which was to commingle the cash proceeds in its general account. Nor was any segregation ever effected. Moreover, the dealings between the parties show that neither party contemplated that receipts from Azad's sales would be segregated into a separate account.[4] The burden of proof in this Circuit clearly rests on the proponent of the constructive trust to show that segregation was required. *Rosenberg v. Collins*, 624 F.2d 659, 663–64 (5th Cir.1980). Azad has not carried this burden.

---

4. And, the bankruptcy court made no contrary findings as to any of these matters.

Hence, as in *Penn–Dixie Steel*, the relationship of Azad and Monnig's resembles most closely one of creditor and debtor. As the Supreme Court has stated under similar circumstances:

"No fund was segregated or set up by special deposit or in any manner.... The bankrupt was a debtor which had failed to pay its debt. We know of no principle upon which that failure can be treated as a conversion of property held in trust.... It would be impossible to state all the circumstances in which equity will fasten a constructive trust upon property in order to frustrate a violation of fiduciary duty. But the mere failure to pay a debt does not belong in that category." *McKey v. Paradise*, 299 U.S. 119, 57 S.Ct. 124, 125, 81 L.Ed. 75 (1936) (citation omitted).

Following the teachings of *McKey*, we hold that to impress a constructive trust there must be at least a wrongdoing greater than the nonpayment of a monetary debt. Monnig's did not agree to, and did not, segregate, or establish a special fund consisting of, the proceeds of Azad rug sales, as Azad obviously knew all along. Paring the license agreement to its essentials, we conclude that Monnig's assumed a simple contractual obligation to pay Azad the net rug sale proceeds on a monthly basis. Monnig's failure to satisfy that debt postpetition cannot be labeled a breach of a fiduciary relationship.[5] We accordingly find that Azad has failed as a matter of law to establish the first of the requirements for imposition of a constructive trust.

### Conclusion

We conclude that there is no evidence of any wrongdoing which would give rise to impression of a constructive trust. The judgment of the district court is therefore

AFFIRMED

---

[5] At the very least this is true where, as here, there is no actual fraud.