**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

No. 95-40204

---

MITCHELL ENERGY CORPORATION,

Plaintiff-Appellee,

MAURICE SHERMAN BLISS, ET AL.,

Intervenor Plaintiff-
Appellee,

versus

SAMSON RESOURCES COMPANY,

Defendant-Appellant.

---

Appeal from the United States District Court
for the Eastern District of Texas
(9:93-CV-83)

---

January 11, 1996

Before WIENER, EMILIO M. GARZA, and BENAVIDES, Circuit Judges.

WIENER, Circuit Judge:[*]

In the action underlying this appeal, a jury found Defendant-Appellant Samson Resources Company (Samson), the lessee/operator of a gas well (the Well), liable for conversion and fraud for its failure to disclose and pay amounts owed to the Appellees as a

[*]Pursuant to Local Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

result of gas production from the Well. Plaintiff-Appellee Mitchell Energy Corporation (Mitchell) is Samson's unleased cotenant[1] in the mineral interests involved in this case; Intervenors-Appellees Maurice Bliss, et al. (Intervenors), lessors of oil and gas leases now owned by Samson, were treated as unleased cotenants based on the jury's finding that Samson had repudiated these leases. The total actual and punitive damages awarded were approximately $3 million and $50 million, respectively. Concluding that Texas law does not support a tort action for conversion or fraud under the instant circumstances, we REVERSE the judgment of the district court in part, MODIFY that judgment in part, and as modified RENDER the judgment in favor of Mitchell and Intervenors.

I

FACTS AND PROCEEDINGS

Samson is lessee and operator of the Well by virtue of several oil and gas leases covering lands within the Samson Trammel Trust Gas Unit #1 (the Unit). The Unit covers 704 acres of the William Johns Survey A-39 in Polk County, Texas.

Beginning in 1980, Samson acquired oil and gas leases from Exxon, Republic National Bank, Trustee, and the Intervenors, covering most of the mineral interests that would eventually

---

[1] As explained more fully below, Samson and Mitchell are cotenants in the mineral interests constituting the Samson Trammel Trust Gas Unit #1. The term "unleased cotenant" has been used by the parties and is used in this opinion to denote the fact that Mitchell did not execute an oil and gas lease with Samson, the lessee/operator who drilled the Well.

constitute the Unit.[2]  Samson drilled the Well and began producing it in 1981.  As permitted by the pooling clauses in the leases, Samson established the Unit by filing a Unit Designation in the public records of Polk County on February 27, 1984.

It turned out, however, that Samson had failed to obtain oil and gas leases covering approximately five percent of the mineral interests comprising the Unit.  Beginning in 1989, Mitchell obtained leases covering these unleased mineral interests while acquiring other leases in the course of doing title work in and around the Unit area for the purposes of its own drilling.  That is how Mitchell came to own an <u>unleased</u> mineral interest in the Unit.

As stipulated at trial, ownership of the Unit is as follows[3]:

| | |
|---|---|
| Mitchell Energy Corporation | 4.93323% |
| Intervenors | 5.55961% |
| Republic National Bank, Trustee | 82.94986% |
| Exxon | 5.20014% |

From 1981 to 1994, the Unit produced gross revenue of over $15 million.[4]  Although Exxon and Republic National Bank, Trustee were paid royalties pursuant to their leases, the Intervenors were not paid royalties, and Mitchell was not paid its share of profits (gross production less expenses) as an unleased cotenant.  Samson

---

[2]  In many cases, the Intervenors are heirs of the original lessors.  In addition, two of the Intervenors' leases were obtained in 1973 by Highland Resources, Inc and later assigned to Samson. Samson obtained ratification of these leases in 1980.

[3]  These ownership percentages total to only 98.64284%.  The owners of the remaining 1.35716% remain unknown.

[4]  The Railroad Commission records reflecting the volume of gas produced from this well are available to the public.

neither notified Mitchell or Intervenors of the well production nor sent division orders to Intervenors for execution.

Mitchell made its first demand for an accounting on February 5, 1991. After Samson refused this demand, Mitchell filed an action in Texas state court for an accounting, as well as damages for conversion and "fraudulent taking." This action was later removed to federal district court by Samson on grounds of diversity. Upon learning of the Well from Mitchell, Intervenors joined the suit and asserted that Samson had breached their leases and committed fraud and conversion. Prior to their joining the suit, Intervenors had made no demand on Samson.

The two sides paint diametrically opposed pictures of Samson's motives and conduct. Samson presented evidence at trial, including several title opinions, indicating that the reason Mitchell and Intervenors had not been paid was because the ownership of those mineral estates was not clear and royalties attributable to the questionable estates were being held "in suspense" until Samson was certain of the true ownerships. Mitchell and Intervenors countered with expert testimony that there was no title dispute in 1980, the year in which Samson began work on the Well, and that Samson had sufficient information to determine the correct ownership of these minerals.

The money due the allegedly unknown owners was not segregated or placed in an escrow account by Samson. Instead, Samson used these funds in its own business, a practice which Samson insists is common in the industry. Some of these funds were distributed by

4

Samson to other working interest owners of the well who were affiliates of Samson. Neither did Samson make accounting entries on its books to reflect the suspension of these funds. Samson describes this bookkeeping omission as a failure of communication among its employees; the Appellees describe it as intentional obfuscation.

The jury found against Samson on both the conversion and fraud claims and assessed actual damages of $1,354,752.11 for Mitchell and $1,664,222.80 for the Intervenors. The jury also found that Samson had repudiated the Intervenors' leases. Accordingly, the actual damages for the Intervenors were calculated as if they were unleased cotenants rather than lessors under the lease agreements. Punitive damages in the amounts of $10 million and $40 million were awarded to Mitchell and the Intervenors, respectively. In addition, the judgment of the district court enjoins Samson to pay Mitchell and Intervenors 100 percent of their mineral percentages in the future, without deduction for expenses, and awards Mitchell attorneys' fees of $65,718.75 pursuant to the Eastern District Civil Justice and Delay Reduction Plan.

Samson filed a Motion for Judgment as a Matter of Law and a Motion for a New Trial, both of which were denied. Samson now appeals.

II

ANALYSIS

A. STANDARD OF REVIEW

A jury's findings of fact will not be overturned unless the

5

facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict.[5]  We review a district court's application of state law de novo.[6]  Most of the relevant facts in this case are uncontested, and this opinion focuses primarily on the district court's determination and application of Texas law.

B.   THE LEGAL RELATIONSHIPS BETWEEN THE PARTIES

Mitchell's predecessors had not leased their mineral interests in the Unit to Samson or anyone else.  Thus, as the owner of undivided mineral interests in the Unit, Mitchell is Samson's unleased cotenant and was properly treated as such by the district court.

The Intervenors, on the other hand, had leased their mineral interests in the Unit to Samson.  The jury found, however, that Samson had repudiated these leases.[7]  Thus, the district court treated the Intervenors as unleased cotenants, rather than as lessors under the lease agreements, which Samson contends was error.  We agree.

In Texas, an oil and gas lease conveys an estate in real property to the lessee, namely, a fee simple determinable in the

---

[5]   Vero Group v. ISS-International Serv. Sys., 971 F.2d 1178, 1181 (5th Cir. 1992).

[6]   Salve Regina College v. Russell, 499 U.S. 225, 231, 111 S. Ct. 1217, 1221, 113 L.Ed.2d 190 (1991).

[7]   Interrogatory No. 3 defined "repudiation" to mean "when a party indicates by its words or actions that it is not going to perform its obligations under an agreement or lease and shows a fixed intention to abandon, renounce and refuse to perform the agreement or lease without just excuse."

mineral estate.[8]  Samson thus retains title to the minerals under its leases for as long as production in paying quantities continues.  Absent a specific lease clause to the contrary, nonpayment of royalty does not terminate an oil and gas lease; the lessee's sole remedy lies in an action for damages based on breach of covenant.[9]

The leases in the instant case contain no clause providing for termination upon the failure to pay royalty.  Moreover, all conditions necessary for Samson to retain the fee (i.e., production in paying quantities) have been satisfied.  Therefore, even assuming that Samson's failure to pay royalties to the Intervenors was intentional, as a matter of law this conduct could not result in Samson's mineral estate terminating and reverting back to the Intervenors.

Intervenors, insisting that Texas law permits an oil and gas lease to be repudiated in these circumstances, erroneously rely on cases discussing the doctrine of repudiation.[10]  That doctrine provides that a <u>lessor</u> may be estopped from asserting that a lease has terminated as a result of the <u>lessee</u>'s nonperformance when the lessor has directly contributed to that nonperformance.[11]  Thus,

---

[8]  <u>Jupiter Oil Co. v. Snow</u>, 819 S.W.2d 466, 468 (Tex. 1991).

[9]  <u>Moriss v. First Nat'l Bank</u>, 249 S.W.2d 269, 279 (Tex. Civ. App.SQSan Antonio 1952, writ ref'd n.r.e.); 1 E. Smith & J. Weaver, TEXAS LAW OF OIL AND GAS § 4.6D at 195-0 (1994).

[10]  <u>E.g.</u>, <u>Cheyenne Resources, Inc. v. Criswell</u>, 714 S.W.2d 103, 105 (Tex. App.SQEastland 1986, no writ).

[11]  1 E. Smith & J. Weaver, TEXAS LAW OF OIL AND GAS § 4.5F at 191 (1994).

this doctrine relieves a lessee from any obligation to conduct operations which are necessary to maintain the lease while a judicial resolution of the controversy between the lessee and lessor over the validity of the lease is pending.[12] The doctrine of repudiation, however, provides no support for Intervenors' position that Samson, the <u>lessee</u>, has repudiated these leases. Furthermore, the other cases relied on by Intervenors involve the rescission of ordinary bilateral contractsSQas opposed to oil and gas leases, which convey estates in realtySQand are therefore inapposite. Thus, we conclude as a matter of law that Samson's oil and gas leasesSQmineral estatesSQhave not terminated by repudiation or otherwise, so that Intervenors must be treated as lessors under oil and gas leases, not as unleased cotenants.

C. CONVERSION

Under Texas law, a party commits conversion if it exercises wrongful dominion and control over personal property belonging to another.[13] The right to payment for minerals already severed from the ground is considered personal property, not realty.[14] Mitchell and Intervenors thus argue that the jury properly found Samson liable for the tort of conversion for failing to pay them the amounts they were owed. We disagree, concluding that Texas law

---

[12] <u>Exploracion de la Estrella Soloataria Inc. v. Birdwell</u>, 858 S.W.2d 549, 554 (Tex. App.SQEastland 1993, no writ).

[13] <u>Waisath v. Lack's Stores, Inc.</u>, 474 S.W.2d 444, 446 (Tex. 1971).

[14] <u>Phillips Petroleum Co. v. Adams</u>, 513 F.2d 355, 363 (5th Cir.), <u>cert. denied</u>, 423 U.S. 930 (1975).

does not support a tort action for conversion of the proceeds of mineral production under these circumstances.

As for Mitchell, it and Samson are cotenants in the mineral interests within the Unit. A unique legal relationship exists between cotenants. Unlike one who is not a party to the cotenancy, any cotenant has the right to extract minerals from the common property without consent or participation of the other cotenants.[15] This right is subject only to a duty to account for the other cotenants' proportionate part of the value of the oil and gas produced, less their proportionate part of the drilling and operating expenses.[16] Thus, the parties do agree that Samson did not convert gas by producing it and selling it.[17] Instead, the issue is whether a tort action lies against Samson for converting the proceeds of the gas sales when it failed to pay Mitchell. We conclude that no conversion action lies.

Mitchell has not cited, and we have not found, a Texas case that has held one cotenant liable for the tort of conversion for failing to pay another cotenant the profits to which that other cotenant is entitled. The law, of course, provides the

---

[15]   Byrom v. Pendley, 717 S.W.2d 602, 605 (Tex. 1986).

[16]   Id.

[17]   Samson argues that Mitchell's concession on this point is fatal because Interrogatory No. 1 asked whether Samson "intentionally converted property or revenues." Samson thus essentially contends that this interrogatory was based on two theories, the first of which (i.e., conversion of real property) was not legally sound. We find this argument unpersuasive in that we do not interpret this interrogatory to be based upon two legal theories.

9

nonconsenting cotenant a remedySQthe right to an accounting.[18] Moreover, a Texas statute also allows, at least in some circumstances, the recovery of interest and attorneys' fees when recovering these amounts due.[19] This right to an accounting for the profits of production, however, is not a tort remedy for which punitive damages are available.

Similarly, the authorities relied on by Mitchell fail to support the contention that conversion is a proper remedy. Although it is certainly true that the Texas courts have found that the proceeds from the sale of oil and gas can be the subject of conversion, each case in which the courts of Texas have so held involved a trespasser or other person with no legal right in and to the minerals.[20] As discussed above, however, a cotenant has the legal right to extract and sell minerals from the common property. Thus, this line of cases lacks relevance to the issue before us. Similarly, the Gardner Machinery case, which involved the conversion of sale proceeds by an agent selling particular items of machinery owned by its principal, is also inapposite.[21]

Texas law does recognize that one cotenant may have an action for conversion against another cotenant in certain limited circumstances. Thus, "a suit for conversion may be maintained by

---

[18]  E.g., Cox v. Davison, 397 S.W.2d 200 (Tex. 1965).

[19]  See Tex. Nat. Res. Code Ann. §§ 91.401-91.406.

[20]  E.g., W.B. Johnson Drilling Co. v. Lacy, 336 S.W.2d 230 (Tex.Civ.App.SQEastland 1960, no writ).

[21]  Gardner Machinery Corp. v. U.C. Leasing, Inc., 561 S.W.2d 897 (Tex.Civ.App.SQBeaumont 1978, writ dism'd).

one tenant in common against another tenant in common who appropriates the _entire_ property owned in common between them."[22] We note that in _Grabes_ the property owned in common was machinery; profits from real property were not involved. The rule announced in that case is inapplicable to the situation at hand. The most that can be said for the instant case is that only proceeds of production have been "appropriated," not the entire mineral estate owned by the cotenants. Therefore, the unique situation under which one cotenant may have an action for conversion against another cotenant is not present.

Mitchell, Intervenors, and Samson all argue that the line of cases involving money as the subject of conversion supports their respective positions on this issue. Texas jurisprudence holds that money can be the subject of conversion, but only when it is in the form of specific chattel, such as old coins, or when "the money delivered is to another party for safekeeping, the keeper claims no title, and the money is required and intended to be segregated, either substantially in the form in which it was received or as an intact fund."[23] An obligation to pay money generally, however, is treated differently under Texas law. "Where money is involved, it is subject to conversion only when it can be described or identified as a specific chattel, but not where an indebtedness may

---

[22] _Grabes v. Fawcett_, 307 S.W.2d 311, 315 (Tex.Civ.App.SQ Texarkana 1957, no writ) (citing _Friemel v. Crouch_, 189 S.W.2d 764 (Tex. Civ. App.SQAmarillo 1945, writ ref'd w.o.m.)) (emphasis added).

[23] _Dixon v. State_, 808 S.W.2d 721, 723 (Tex. App.SQAustin 1991, writ dism'd w.o.j.).

11

be discharged by the payment of money generally."[24]

We first note that none of these "money conversion" cases involves the right of a cotenant with respect to profits from the common property. Thus, these cases are not truly on point. Although Mitchell does have a right to a percentage of the profits of production, this does not give Mitchell a right to a specific and identifiable portion of the proceeds received that could be considered specific chattel. Rather, Mitchell's right is to an amount equal to its proportionate share of the value of gas produced, which is not necessarily the same as the amount of the sale proceeds less reasonable drilling and operating expenses. Therefore, regardless of the extent to which this line of cases may be relevant, we are satisfied that the obligation owed to Mitchell under the law of cotenancy is more analogous to an obligation to pay money generally than to return or deliver money as specific chattel. Moreover, this conclusion comports with the fact that the law of cotenancy provides no remedy for conversion under these circumstances.

Mitchell further argues that Texas Property Code section 75.102 supports a conversion action against a cotenant. That section provides that "[a] holder of abandoned property shall preserve that property and may not by any procedure, including a

_____

[24] Crenshaw v. Swenson, 611 S.W.2d 886, 891 (Tex.Civ.App.SQAustin 1980, writ ref'd n.r.e.). See Gronberg v. York, 568 S.W.2d 139, 144 (Tex.Civ.App.SQTyler 1978, writ ref'd n.r.e.) (holding that an employee could not recover against his employer on the theory of conversion when he did not seek return of specific money but was only seeking repayment of money generally which he alleged was wrongfully withheld from his commissions).

12

deduction for service, maintenance, or other charge, transfer, convert, or reduce the property to the profits or assets of the holder."[25] This unclaimed property statute has no application to the rights and remedies of cotenants. Neither does the mere use of the word "convert" in an illustrative list somehow create a cause of action in tort where none exists independently. Therefore, this argument by Mitchell fails.

At oral argument, Mitchell conceded that normally the only remedy available in this type of situation is an action for an accounting. Mitchell insists, however, that this case is different because Samson neither made a bookkeeping entry to reflect that these funds were held in suspense nor placed them in escrow. We are not convinced that the omission of these actsSQwhich are not expressly required by lawSQcan somehow transform a right to an accounting into the tort of conversion. Accordingly, we conclude that Mitchell has no action in conversion against its cotenant, Samson, to recover its share of profits in the mineral estate.

We reach the same conclusion as to Intervenors. As discussed above, they are properly treated as Samson's lessors under the oil and gas leases, not as Samson's cotenants. Their causes of action sound only in contract, and not in tort.[26] Thus, Intervenors too have no claim for conversion.

---

[25] TEX. PROP. CODE ANN. § 75.102 (Vernon 1995) (emphasis added).

[26] See Harrison v. Bass Enter. Prod. Co., 888 S.W.2d 532, 536 (Tex. App.SQCorpus Christi 1994, no writ).

13

D.  FRAUD

The jury also found that Samson had committed fraud.  This finding was based on Samson's failure to disclose material facts (i.e., that money was owed to Mitchell and Intervenors as a result of gas production from the Well), which it purportedly had a duty to disclose pursuant to an asserted fiduciary relationship.  Samson contends that such a position is not supported under Texas law—and we agree.

Absent a fiduciary or confidential relationship, the failure to disclose information is not actionable as fraud.[27]  Under Texas law neither a cotenancy nor a lessor/lessee relationship imports a fiduciary relationship.[28]  Although a confidential relationship can arise not only from technical fiduciary relationships but from partnerships, joint ventures, and some informal relationships,[29] there is no evidence in this case to suggest the existence of some other relationship between Samson on the one hand and either Mitchell or Intervenors on the other that could support such a finding by the jury.

---

[27]  Tempco Tamers, Inc. v. Grow-Houston Four, Ltd., 715 S.W.2d 658, 669 (Tex. App.—Dallas 1986, writ ref'd n.r.e.).

[28]  Matter of Fender, 12 F.3d 480, 486 (5th Cir. 1994) (holding that under Texas law cotenancy law "there is no fiduciary or agency relationship (which might create such a duty) between the cotenants unless they create it by agreement."); see Hurd Enter. v. Bruni, 828 S.W.2d 101, 111-12 (Tex. App.—San Antonio 1992, writ denied); Cambridge Oil Co. v. Huggins, 765 S.W.2d 540, 544 (Tex. App.—Corpus Christi 1989, no writ) (holding that no confidential or fiduciary relationship existed between oil and gas lessee and lessor).

[29]  See Monnig's Dep't Store, Inc. v. Azasd Oriental Rugs, Inc., 929 F.2d 197 (5th Cir. 1991).

14

Mitchell contends that Samson had a fiduciary duty of disclosure as a matter of law, arguing that the duty to account, by its very nature, includes the duty to disclose. No authority is cited for this contention, and we have found none through our own research. Mitchell's argument does not withstand scrutiny: It emerges as simply an attempt to bootstrap a cotenant's right to an accounting into the tort of fraud based on failure to render an accounting.

Mitchell further contends that Samson was a trustee of that portion of the proceeds of production from the Well to which Mitchell was entitled. Mitchell relies on a single phrase from a single Texas case in which it is stated that "rents and profits received by one cotenant are held by him in trust for his cotenants."[30] That case then goes on to state that for the cotenant to acquire title to these funds as a result of the running of the statute of limitations, the cotenant must have repudiated the trust.

Mitchell's reliance on this isolated phrase is misplaced. True, the "in trust" language of the case makes clear that the one cotenant does not own the proceeds allocable to the other cotenant, and describes the implications for the statute of limitations. Nevertheless, this isolated and imprecise use of the word "trust" does not justify the stretch that would be required to approbate Mitchell's assertion that a cotenant's failure to disclose

---

[30] Eddings v. Black, 602 S.W.2d 353, 358 (Tex. Civ. App.SQEl Paso 1980, writ ref'd n.r.e.) (emphasis added).

15

information regarding an accounting results in a breach of a fiduciary duty which in turn can serve as the basis for the tort remedy of fraud. Other Texas cases that involve an accounting owed by a cotenant do not mention a fiduciary duty.

We conclude that Samson had no confidential or fiduciary duty vis-à-vis Mitchell or Intervenors. It follows that no actionable fraud could arise from Samson's failure to disclose information about production from the Well or to pay them their respective shares of the proceeds thereof.

E. MODIFICATION OF JUDGMENT

Samson concedes that, as a cotenant, Mitchell is entitled to an accounting for its share of the net proceeds of production, and that Intervenors are entitled to royalty payments in accordance with their lease agreements. Moreover, the parties have stipulated to minimum payments due based on evidence presented to the district court. As the record evidence available to us is sufficient to permit a determination of the payments to which Mitchell and Intervenors are entitled on the basis of our holding, we need not remand this case to the district court for the calculation of various amounts due and entry of judgment therefor.

1. Actual Damages for Mitchell

In calculating the actual damages for Mitchell, the district court awarded an amount equal to Mitchell's ownership percentage of the gross revenues produced by the Well. The court did not deduct Mitchell's share of expenses and taxes from the gross amount of the actual damages. This was error. Under Texas law, a producing

16

cotenant must account to nonproducing cotenants "on the basis of the value of any minerals taken, <u>less</u> the necessary and reasonable costs of production and marketing."[31] Thus, Mitchell's actual damages must take into consideration Mitchell's share of the operating expenses.

Citing <u>Mayfield v. de Benavides</u>,[32] Mitchell argues that Samson is a willful and deliberate converter who should not be able to recover costs of production. <u>Mayfield</u>, however, holds that a <u>bad faith trespasser</u>'s measure of damages does not include the recovery of drilling and operating costs.[33] In addition to the fact that no finding was made that Samson was a bad faith trespasser, Samson's valid leases with Exxon and Republic National Bank, Trustee, would preclude such a finding as a matter of law. Thus, the district court's damage calculation for Mitchell is wrong and must be reduced by Mitchell's share of drilling and operating costs, taxes, and the like.

Based on the evidence in the record (and before taking into account prejudgment interest), the amount of actual damages payable to Mitchell, calculated through September 30, 1994, is $424,999.82.

2. <u>Actual Damages for the Intervenors</u>

The district court awarded actual damages to the Intervenors as though they were unleased cotenants, rather than royalty owners,

---

[31] <u>Byrom</u>, 717 S.W.2d at 605 (emphasis added).

[32] 693 S.W.2d 500 (Tex. App.SQSan Antonio 1985, writ ref'd n.r.e.).

[33] <u>Mayfield</u>, 693 S.W.2d at 506.

17

based on the jury's finding that Samson repudiated the Intervenors' leases. As with Mitchell, this calculation was not reduced by the Intervenors' share of expenses.

That is immaterial as to Intervenors, though, because as a matter of law the nonpayment of royalty cannot support a finding that Samson repudiated their leases. Accordingly, the Intervenors' damages must equate with their royalty interests under their leases, not with the share of gross proceeds attributable to their fee ownerships, regardless whether or not the latter is reduced by costs and expenses of production.

In light of the evidence in the record (and before taking into account prejudgment interest), the amount of royalty payments due and owing to Intervenors, through September 30, 1994, is $109,035.17.[34]

3. Prejudgment Interest

The district court's judgment calculation included a Treasury bill (T-bill) rate of interest applied to the actual damages. On top of that, prejudgment interest at a rate of 10 percent per annum was added to the damages, which already included interest, clearly

_____

[34] These actual damages are allocated among the Intervenors as follows:

| | |
|---|---|
| Bliss Interest | $ 3,336.60 |
| Mayo Interest | 5,735.31 |
| Hair Interest | 7,647.04 |
| McCracken Interest | 33,367.01 |
| Gullick Interest | 7,647.04 |
| Nance Interest | 25,025.43 |
| Rowlan Interest | 25,025.43 |
| Cannon Interest | 1,251.31 |
| Total | $109,035.17 |

constituting a double interest award.

State law governs the award of prejudgment interest in diversity cases.[35] Under Tex. Rev. Civ. Stat. Ann. art. 5069-1.05, the proper rate of prejudgment interest is 10 percent per annum, not a T-bill rate of interest. Moreover, the district court erred in awarding a double recovery for the time value of money.[36] As Mitchell and Intervenors all but concede, the damage award should include only one recovery for the time value of money, and that one recovery should be calculated using the statutory 10 percent per annum rate for prejudgment interest.[37] Therefore, taking into account the correct rate of prejudgment interest through February 2, 1995, the day before the district court's judgment was signed, the judgment for actual damages through September 30, 1994 is modified as follows:

| <ins>Appellee</ins> | | <ins>Actual Damages</ins> |
|---|---|---|
| Mitchell | | $ 766,719.00 |
| Bliss Interest | $ 6,308.94 | |
| Mayo Interest | 10,844.50 | |
| Hair Interest | 14,459.25 | |
| McCracken Interest | 63,091.35 | |
| Gullick Interest | 14,459.25 | |
| Nance Interest | 47,318.84 | |
| Rowlan Interest | 47,318.84 | |
| Cannon Interest | 2,366.01 | |

---

[35] <u>Harris v. Mickel</u>, 15 F.3d 428, 429 (5th Cir. 1994).

[36] <u>Texas Farmers Ins. Co. v. Soriano</u>, 844 S.W.2d 808, 830-31 (Tex. App.SQSan Antonio 1992), <u>rev'd on other grounds</u>, 881 S.W.2d 312 (Tex. 1994).

[37] The damages awarded by the district court reflect an interest rate of <u>less</u> than 10 percent.

19

|                          |              |
|--------------------------|--------------|
| Total For Intervenors    | 206,167.00   |
| Total Actual Damages     | $ 972,886.00 |

Post-judgment interest on money judgments recovered in federal district court is governed by 28 U.S.C. § 1961, even in diversity cases.[38]  As the district court's judgment provided, this entire judgment, which Mitchell and the Intervenors shall have and recover against Samson in the amount of $977,886, plus costs of court, shall earn interest at the rate of 7.03%, compounded annually, beginning on February 3, 1995, the day the district court's judgment was signed, in accordance with 28 U.S.C. § 1961.[39]

### 4. Punitive Damages

Texas law requires the existence of an independent tort to support an award of punitive damages.[40]  In this case, the independent torts of conversion and fraud are not supported by Texas law.  The remedies to which Mitchell and Intervenors are entitled, flowing as they do from actions for an accounting and for breach of contractSQand not from tortSQdo not supply a basis for punitive damages.[41]  Therefore, the judgment with respect to the award of punitive damages is reversed and vacated.

---

[38]  Nissho-Iwai Co. v. Occidental Crude Sales, 848 F.2d 613, 622 (5th Cir. 1988).

[39]  See Fuchs v. Lifetime Doors, Inc., 939 F.2d 1275, 1280 (5th Cir. 1991) (awarding post-judgment interest on the entire amount of the judgment, including prejudgment interest).

[40]  See Jim Walter Homes, Inc. v. Reed, 711 S.W.2d 617, 618 (Tex. 1986).

[41]  See id.

5. <u>Additional Relief</u>

Under the heading "Additional Relief Granted," the district court "Orders that Samson Resources Company pay to Mitchell Energy Corporation 100% of its mineral interests and Intervenors 100% of their mineral interests based on future production after September, 1994 for such time as the well in question produces in paying quantities, without allowance for deduction of expenses."

The amounts ordered to be paid in this "additional relief" portion of the district court's judgment are incorrect. Instead, as we have noted, Mitchell's future right is to receive timely its proportionate part of the proceeds of production <u>less</u> reasonable operating expenses; and Intervenors' future right is to receive royalty payments timely, pursuant to the terms of their respective lease agreements. In light of our reversal of the judgment that was premised on the theories of conversion and fraud and the fact that the parties have an adequate remedy at law, we see no need to remand this "additional relief" aspect of the district court's judgment for disposition by that court. Accordingly, the judgment with respect to the "additional relief" is reversed and vacated.

6. <u>Attorneys' Fees</u>

The district court's judgment also awards Mitchell attorneys' fees in the amount of $65,718.75 pursuant to the Eastern District of Texas Civil Justice and Delay Reduction Plan (Eastern District Plan).[42] The sole foundation for Mitchell's attorneys' fees claim

_____

[42] The relevant portion of the Eastern District of Texas Civil Justice and Delay Reduction Plan reads as follows:

21

is its letter of November 15, 1993. Mitchell contends that this letter constitutes an "offer of judgment" within the meaning of the Eastern District Plan. Samson counters that Mitchell's letter is not sufficient, that it is merely a settlement proposal. We agree with Samson.

The letter in question states Mitchell's belief that it is "entitled to receive in settlement of the matter the sum of $246,093.06 for past production plus $143,921.13 as pre-judgment interest at the rate of 10%." The next sentence in the letter contains an offer to settle the case by having Mitchell sell its working interest to Samson for approximately $91,000, with conditions on the royalty interest. And the sentence after that proposes, as an alternative to sale, that the parties enter into an

---

**Article Six. Miscellaneous Matters**

(9) **Offer of Judgment.** At the Management Conference or anytime thereafter, a party may make a written offer of judgment. If the offer of judgment is not accepted and the final in the case is of more benefit to the party who made the offer by 10%, then the party who rejected the offer must pay the litigation costs incurred after the offer was rejected. In personal injury and civil rights cases involving contingent attorneys' fees, the award of litigation costs shall not exceed the amount of the final judgment. The Court may, in its discretion, reduce the award of litigation costs in order to prevent undue hardship to a party.

"Litigation costs" means those costs which are directly related to preparing the case for trial and actual trial expenses, including but not limited to reasonable attorneys' fees, deposition costs and fees for expert witnesses.

The party who makes an offer of judgment shall set forth the deadline by which the offer must be accepted. The deadline must be reasonable. If the offer is not accepted in writing by the deadline, the offer is deemed rejected on that day.

22

operating agreement.

More significant than what Mitchell's letter says is what it does not say:  It makes no reference to offering a "judgment"; it appears to contemplate future negotiations; and it is also unclear whether this settlement offer is conditioned on entering a sale or an operating agreement.  Additionally, although the Eastern District Plan does not specify a format or require any "magic words" for an offer of judgment, it does provide that the offer must specify a deadline.  The closest thing to a deadline in Mitchell's letter is the closing sentence which states, "I look forward to hearing from you this week."  It would be too great a stretch to call this imprecise languageSQwhich appears to be little more than a courteous salutationSQa deadline, particularly given the other shortcomings of Mitchell's letter.

These observations lead us to conclude that Mitchell's letter does not rise to the level of an "offer of judgment" within the contemplation of the Eastern District Plan.  Accordingly, the award of attorneys' fees for Mitchell is vacated.

III

CONCLUSION

Samson failed to disclose or pay the amounts owed to Mitchell and Intervenors as a result of gas production from the Well.  As Samson's cotenant, Mitchell's remedy is an action for an accounting of its proportionate share of the Well's profits, i.e., the value of the gas produced less drilling and operating expenses.  As Samson's lessors, Intervenors' remedy is a breach of contract claim

23

against Samson for the royalty payments owed to them pursuant to the terms of their respective lease agreements. Under Texas law, Samson retains the mineral estate conveyed to it by the oil and gas leases entered into with the Intervenors. Neither Mitchell nor the Intervenors can maintain an action in tort against Samson for conversion or fraud under these circumstances, and absent an independent tort, punitive damages do not lie. As the evidence before the court is sufficient to enable us to calculate the damages for which Samson is liable based on our holdings, the judgment of the district court is reversed and vacated in part, modified in part, and, as modified, rendered, as follows: Samson to pay Mitchell $ 766,719, plus costs of court, plus post-judgment interest from February 3, 1995, until paid in full, at the rate of 7.03% per annum; and Samson to pay Intervenors $ 206,167, plus costs of court, plus post-judgment interest from February 3, 1995, until paid in full, at the rate of 7.03% per annum.

REVERSED and VACATED in part; MODIFIED in part; and, as modified, RENDERED.